[No. 46690.   En Banc.   December 31, 1980.]

ANN M. KEOGAN, *as Administratrix,* ET AL, *Petitioners,*
v. HOLY FAMILY HOSPITAL, ET AL, *Respondents.*

*Morrow, Longfelder, Tinker & Kidman, Inc., P.S.,* by *Kerry D. Kidman* and *Albert Morrow* and *Vovos, Voermans & Murphy,* by *Mark E. Vovos,* for petitioners.

*MacGillivray, Jones, Clarke, Schiffner & Johnson,* by *Frank Hayes Johnson* and *Gregory G. Frazier* and *Halverson, Applegate & McDonald,* by *Alan A. McDonald,* for respondents.

HOROWITZ, J.—This case concerns a medical malpractice action against the doctors who treated a heart attack victim and against the hospital where he died. The trial jury returned a general verdict for the defendants. Because the trial court erred in refusing to give an informed consent instruction and in refusing to find certain defendants negligent as a matter of law in treating the deceased, we reverse the judgment in favor of defendants and remand the cause for trial to determine whether defendants' negligent conduct was the proximate cause of the patient's death occasioning the plaintiffs' suit for damages here.

A summary of the facts will demonstrate the basis for our holding.

## I

On February 16, 1972, 37–year–old Timothy Keogan consulted his family physician, Dr. Kenneth Snyder, regarding intermittent mid–chest pain that Keogan had begun to experience upon mild exertion. Dr. Snyder did a physical examination and X–rayed Keogan's chest and abdomen. He also took a resting electrocardiogram (EKG) and cardiac enzyme tests. The resting EKG will show heart muscle death only while or shortly after it occurs; Keogan's EKG was within normal limits. The cardiac enzyme tests are short–term indicators of recent heart muscle death. X–ray will not show heart muscle damage.

Although Dr. Snyder testified that he suspected angina pectoris (which is usually accompanied by heart disease) as the cause of Keogan's chest pain, he neither informed Keogan of this suspicion of angina nor performed any of

the three tests then readily available in Spokane to diagnose angina—nitroglycerine, a treadmill EKG, or angiography.

These tests help diagnose angina in various ways. Nitroglycerine, when placed beneath the tongue during an angina attack, will quickly relieve the chest pain by dilating the blood vessels in the heart area, allowing blood to flow through the arteries without restriction. If nitroglycerin does not lessen chest pain, the possibility of angina can be discounted. Nitroglycerin testing was readily available to family physicians in 1972. A treadmill EKG is taken while the patient is exerting himself and will show whether insufficient oxygen is reaching the heart and thus causing angina. Although not generally available in family physicians' offices in 1972, it was widely used by specialists and there was testimony that it would have been 80 percent or more effective in diagnosing angina in Keogan's case. Angiography involves injecting an opaque dye into the coronary arteries to determine whether, and to what extent, the arteries are obstructed and may cause chest pain. It is highly accurate but was available only in specialists' offices and presented a risk of death of .2 to .3 of 1 percent in 1972.

Instead of performing or informing Keogan of the availability of these tests, of which the doctor was aware, Dr. Snyder, with no additional testing, diagnosed Keogan's condition as an inflammation of sternum cartilage. He advised Keogan to restrict his activities and scheduled another office visit. Dr. Snyder testified that Keogan "gave me somewhat of an argument" about the possibility of heart problems and that Keogan stated his belief that he was suffering from a flu virus that had recently affected his family.

On February 29, 1972, Keogan returned to Dr. Snyder complaining of pain and gastric problems after eating. There was testimony that this was a symptom of worsening angina, since it indicated that it was taking less effort by Keogan—*i.e.,* merely digestion—to cause chest pain. Dr.

Snyder had received the results of the cardiac enzyme tests, which were not within normal limits; testimony as to the severity of the abnormality varied. After taking another resting EKG, which was not normal, and conducting another set of cardiac enzyme tests, Dr. Snyder prescribed for Keogan an antacid and Sorbitrate, a long–acting nitrate similar to nitroglycerine that is usually used for treatment of angina. Dr. Snyder told Keogan that Sorbitrate was for chest pain, but again he did not tell his patient of the possibility of angina and heart disease, or that Sorbitrate was prescribed for angina, or of possible diagnostic tests for angina.

Keogan's wife testified that in the following week Keogan called Dr. Snyder three times complaining of increasing chest pain radiating into his arms; Dr. Snyder denies these conversations. At about 3 a.m. on March 6, 1972, Keogan collapsed at home and was taken by ambulance to Holy Family Hospital's emergency room where he arrived at approximately 4 a.m. There was testimony that upon Keogan's arrival at the emergency room he had a 90 percent chance of survival with appropriate medical care. Mrs. Keogan testified that her husband was in pain, pale, sweating, and short of breath; emergency room physician Dr. Anthony Appel, Holy Family's employee,[1] testified that Keogan did not look bad when he first saw him 30 minutes after Keogan was brought to the hospital.[2] It was uncontroverted, however, that Keogan was on his hands and knees on the hospital bed in an effort to assuage his pain during most of the time he spent in the emergency room.

Dr. Appel did a brief physical examination and took Keogan's blood pressure, which was high. No EKG was

---

[1] Under the doctrine of respondeat superior, Holy Family Hospital is liable for damages if its employee Dr. Appel is found liable.

[2] In interrogatory answers read into the record at trial, defendant Holy Family Hospital stated that the reason for Keogan's admission was "severe chest pain, shortness of breath, occasional profuse sweating, emesis [vomiting] several times this day; none previously."

performed. The Keogans told Dr. Appel that the tests taken by Dr. Snyder had shown nothing amiss, but Dr. Appel noted in the emergency room record that Keogan had complained to Dr. Snyder of "chest pain" in the past. He stated, however, that Keogan pointed to his upper stomach, and not his chest, in describing the pain he experienced in the emergency room. Believing that Keogan was suffering from anxiety, Dr. Appel prescribed Valium. This appeared to have no effect on his pain, and Keogan became nauseous.

Dr. Appel telephoned Dr. Snyder at about 4:45 a.m. Although the doctors' versions of the conversations vary, it appears that Dr. Snyder did not reveal the results of tests or the drugs earlier prescribed for Keogan and did not ask what procedures had been thus far taken at the hospital, while Dr. Appel did not disclose Keogan's arrival by ambulance nor treatment undertaken up to that time. Dr. Snyder testified that he assumed an EKG had already been performed at the hospital.

After talking to Dr. Snyder, Dr. Appel returned to tell Keogan he was being released. However, on the Keogans' insistence, Dr. Snyder was contacted again and Keogan was admitted to a general medical care room at 5:30 a.m. Maalox and Valium were prescribed for him. At 6:40 a.m., a nurse on the general medical floor called Dr. Snyder about Keogan's deteriorating condition, poor color, and irregular, rapid pulse. Dr. Snyder prescribed by phone a nonnarcotic analgesic and a tranquilizer used for nausea. These drugs had no effect on Keogan's condition. Nurses' notes at 7:30 a.m. recorded that Keogan's blood pressure was difficult to hear and that he was complaining of "severe chest pain continually." At 7:50 a.m., Dr. Snyder returned another call from the nurse and prescribed morphine and oxygen.

Dr. Snyder's partner, who was in the hospital on another matter, soon thereafter saw Keogan and ordered him moved to the hospital's cardiac care unit, where he arrived at 8:35 a.m. The first EKG performed at the hospital, taken at 9:15 a.m., showed substantial death of the heart muscle

(heart attack). Keogan's condition quickly worsened; his heart stopped and he was resuscitated twice before dying at 1:35 p.m. March 6, 1972.

Keogan's wife and four children by a previous marriage began this action in Spokane County Superior Court against Dr. Snyder, Dr. Appel, and Holy Family Hospital. The trial jury by a vote of 10 to 2 returned a verdict for the defendants. Plaintiffs' motions for judgment notwithstanding the verdict and a new trial were denied.

The Court of Appeals, Division Three, originally affirmed the trial court in an opinion found at 22 Wn. App. 366, 589 P.2d 310 (1979) (*Keogan* I). Plaintiffs' motion for reconsideration was stayed pending this court's decision in *Gates v. Jensen,* 92 Wn.2d 246, 595 P.2d 919 (1979). At 24 Wn. App. 583, 601 P.2d 1303 (1979) (*Keogan* II) the Court of Appeals denied plaintiffs' motion even after consideration of the applicability of *Gates.* We granted plaintiffs' petition for review of the trial court's refusal to give proposed informed consent instructions and its refusal to find as a matter of law that the defendants had deviated from the medical standard of care applicable to the facts of this case.

We now reverse the Court of Appeals based on our answers to the following questions:

A. Did the trial court err in refusing to give proposed informed consent instructions?

1. Did the trial court err in refusing to give an instruction informing the jurors Dr. Snyder had a duty to disclose to Keogan proposed treatment and alternatives, including diagnostic procedures, available to determine whether Keogan was experiencing angina under the facts of this case? *Yes.*

2. Did the trial court err in refusing to give a general informed consent instruction which would have imposed a duty to disclose on Dr. Appel under the facts of this case? *No.*

B. Did the trial court err in refusing to find the defendants negligent as a matter of law?

1. Did Dr. Snyder deviate from the applicable standard of care as a matter of law in failing to rule out the possibility of heart disease through his treatment of Keogan under the facts of this case? *No.*

2. Did Dr. Appel deviate from the applicable standard of care as a matter of law in failing to administer an EKG when the deceased, a middle–aged male patient, was taken by ambulance to the emergency room complaining of severe mid–chest pain? *Yes.*

## II
### INFORMED CONSENT

Plaintiffs contend they were entitled to instructions setting forth Dr. Snyder's and Dr. Appel's duty to disclose to Keogan the alternative diagnostic tests and treatments available to establish and attempt to control his mid–chest pain. Plaintiffs now rely principally on *Gates v. Jensen, supra* at 251:

> The physician's duty of disclosure arises . . . whenever the doctor becomes aware of an abnormality which may indicate risk or danger. . . . The facts which must be disclosed are all those facts the physician knows or should know which the patient needs in order to make the decision [regarding the course which the patient's medical care will take].

(Citation omitted.) Thus, plaintiffs contend that (a) the duty to disclose had arisen and (b) Dr. Snyder and Dr. Appel failed in their duty by not disclosing all the facts Keogan needed to make a decision regarding the diagnosis and treatment of his mid–chest pain.

The defendants strongly assert, however, that the duty to disclose had not arisen and that at any rate there was no duty to disclose the existence of alternative diagnostic tests. It is contended that neither Dr. Snyder nor Dr. Appel had diagnosed Keogan's condition and formulated a proposed treatment. It is further argued that Dr. Snyder's care of the deceased thus involved no risk to Keogan. *See Keogan* II, *supra* at 585.

Consideration of the parties' contentions necessitates a brief examination of the doctrine of informed consent.

## A
### HISTORY OF DOCTRINE

The phrase "informed consent" refers generally to legal theories of recovery in medical tort cases that depend, not on the appropriateness or inappropriateness of the doctor's diagnosis and treatment of the patient's condition, but on the patient's right to know the condition of his body and to make a decision regarding his medical care. In his fiduciary relationship with the patient, the physician has a duty to disclose relevant facts about the patient's condition and care. If the physician has not given the patient all the information necessary for the patient to make a knowledgeable decision regarding his medical care, the patient's "consent" to the course of action taken by the physician is not "informed." The doctor's breach of his fiduciary duty to the patient may make him liable if damages result because the patient, if apprised of all of the material facts, would not have agreed to the physician's course of action.

The doctrine of informed consent was originally developed as part of the intentional tort of battery. If the patient had consented to the bodily touching entailed in the doctor's treatment of his condition, no action for battery could lie at common law. In order to prevent physicians from completely avoiding tort responsibility merely by always getting the unknowledgeable patient's assent to treatment, courts recognized that, as in other areas of intentional tort law, the individual's consent to the otherwise actionable behavior must be "informed" to be valid. The individual must know to what he is consenting. *See generally* Smith, *Therapeutic Privilege to Withhold Specific Diagnosis from Patient Sick with Serious or Fatal Illness,* 19 Tenn. L.J. 349 (1946).

From these beginnings, the doctrine of informed consent has developed into a judicial affirmation of the individual's

right to ultimately control what happens to his body. As stated by Justice Cardozo:

> Every human being of adult years and sound mind has a right to determine what shall be done with his own body . . .

*Schloendorff v. Society of N.Y. Hosp.,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914). Thus the doctrine now focuses on the patient's right to *know* the condition of his body and to *decide* what should be done with regard thereto. As with the entire subject of medical malpractice, the development of the doctrine has been fraught with difficulties, both medical and legal. Development of the informed consent analysis and its present justification has been gradual, focusing around the determination of (a) *when* there is a duty to disclose and (b) *what* must be disclosed once the duty arises. As will be seen in the two sections immediately following, the parties' differences in this case center on these two considerations.

## B
### WHEN DUTY TO DISCLOSE ARISES

■ Because the doctrine of informed consent is based on the patient's right to self–determination, particularly with regard to the treatment of medical abnormalities of his condition, "[t]he physician's duty of disclosure arises . . . whenever the doctor becomes aware of an abnormality which may indicate risk or danger." *Gates v. Jensen, supra* at 251. As established by *Miller v. Kennedy,* 11 Wn. App. 272, 285–86, 522 P.2d 852 (1974), *aff'd per curiam,* 85 Wn.2d 151, 530 P.2d 334 (1975):

> Once it has been established by expert medical testimony that a risk existed, then the existence of the risk is the patient's business; and it is not for the medical profession to establish a criteria for the dissemination of information to the patient based upon what doctors feel the patient should be told. . . . The patient has a right to know and the doctor has the duty to inform the patient whether the doctor wants to or not. The fiduciary duty of the doctor requires disclosure.

This duty to disclose material facts arises as "to each item of information which the doctor knows or should know about the patient's physical condition", *Miller v. Kennedy, supra* at 282.

The physician's duty requires him to alert the patient to medical abnormalities whatever the stage of treatment:

> The patient's right to know is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed. Important decisions must frequently be made in many nontreatment situations in which medical care is given, including procedures leading to a diagnosis, as in this case. These decisions must all be taken with the full knowledge and participation of the patient.

*Gates v. Jensen,* 92 Wn.2d 246, 250, 595 P.2d 919 (1979). Thus, in this case, the duty to disclose with regard to Dr. Snyder had arisen. Dr. Snyder testified that Keogan's mid–chest pain constituted an abnormality, and that he suspected angina as the cause of the pain. Instead of fulfilling his duty to disclose, as set forth in the following section, Dr. Snyder began *treating* Keogan for a stomach ailment and for mild heart trouble—through the prescription of an antacid and Sorbitrate—without allowing Keogan to determine for himself if additional diagnostic procedures should be pursued to determine the cause of his chest pain. The fact that Keogan's symptoms were "inconclusive," as noted in *Keogan* II, *supra* at 584, does not prevent the doctrine of informed consent from applying. It merely points out the duty to inform the patient of potentially fatal causes of his abnormality, and the means of ruling out or confirming this source of illness. Of similar significance was Dr. Snyder's testimony that Keogan was "argumentative" about the possibility of heart problems. This serves to confirm the duty to fulfill the patient's need to be apprised of the seriousness of potential ailments and the means of determining whether the patient's belief that the cause of his symptoms is minor is based on fact through the use of alternative diagnostic techniques.

Likewise, Dr. Appel's duty to disclose would arguably have arisen when he saw Keogan, in severe pain, in the emergency room. The patient's condition was abnormal, indicating risk or danger, and thus would have caused the duty to disclose to arise under the doctrine of *Gates v. Jensen, supra* at 251. However, the uncontroverted fact that this was a true emergency prevented the duty to disclose alternative diagnostic techniques from applying. It is generally agreed that the doctrine of informed consent does not apply in emergency situations requiring immediate action, and we are unaware of the doctrine's application in any case in which disclosure would be made useless by the medical emergency presented. *See generally* Shartsis, *Informed Consent: Some Problems Revisited,* 51 Neb. L. Rev. 527, 529, 531 (1972) (and cases cited therein); Note, *Informed Consent Liability,* 26 Drake L. Rev. 696, 707–08 (1977). The absence of an emergency has often been important in the court's decision to impose a duty to disclose. *Natanson v. Kline,* 187 Kan. 186, 189, 354 P.2d 670, 672 (1960); Plante, *An Analysis of "Informed Consent",* 36 Fordham L. Rev. 639, 653–54 (1968). With a patient in such obvious severe pain as Keogan was in in the emergency room, the physician's responsibility must be primarily to attempt to alleviate the pain.

Dr. Appel could not, under the circumstances of this case, have been expected to inform the patient of alternative diagnostic procedures available to determine the cause of his symptoms. The testimony was uncontroverted that Keogan was interested only in surcease of his pain through any means available to the hospital staff and that he would have agreed to any care relieving such pain. Keogan's condition was such that if not immediately diagnosed and treated, it would probably lead to serious disability or death; immediate use of the EKG for diagnosis was necessary to determine the existence of Keogan's heart condition. These factors—Keogan's intense pain, the need for immediate diagnosis of his condition, and the fact that his

condition actually was such that it could lead to irremediable disability and quick death—created a medical emergency in which the emergency room physician could not be held to the physician's duty to disclose that is applicable to nonemergency medical care.

Thus, we must conclude that, unlike Dr. Snyder, Dr. Appel did not have a duty to disclose alternative diagnostic procedures before providing immediate emergency treatment for Keogan under the circumstances of this case. The trial court held that the doctrine of informed consent was "inapplicable" but assigned no specific reason for its conclusion. With regard to Dr. Appel the trial court's conclusion was correct, and we uphold its ruling because "[w]here a judgment or order is correct it will not be reversed merely because the trial court gave wrong or insufficient reason". *Pannell v. Thompson,* 91 Wn.2d 591, 603, 589 P.2d 1235 (1979). When the facts and law indicate an appropriate reason for the trial court's decision we must affirm the trial court on the basis of the applicable law, "even though the attorneys representing the parties are unable or unwilling to argue it." *Maynard Inv. Co. v. McCann,* 77 Wn.2d 616, 623, 465 P.2d 657 (1970).

We then must turn to Dr. Snyder's contentions that even as to his nonemergency care of Keogan, the plaintiffs have not demonstrated the applicability of the duty to disclose under the doctrine of informed consent. Dr. Snyder now asserts for the first time that the duty to disclose had not yet arisen because there was no evidence that "a reasonably prudent physician in the medical community in the exercise of reasonable care, would disclose". *ZeBarth v. Swedish Hosp. Med. Center,* 81 Wn.2d 12, 23, 499 P.2d 1, 52 A.L.R.3d 1067 (1972). The defendant Dr. Snyder relies on the case's statement that "in most instances, and as a general rule, the duty to inform the patient must be established by expert medical testimony". *ZeBarth v. Swedish Hosp. Med. Center, supra* at 24.

This holding of *ZeBarth* is clearly no longer the law in this state. *Miller v. Kennedy, supra,* superseded the transitional analysis of *ZeBarth* and reached the only rational conclusion that the *patient's* rights to self–determination cannot be solely dependent on expert medical testimony. *Miller v. Kennedy, supra* at 152 ("We can add nothing constructive to the well considered opinion of that court and, accordingly, approve and adopt the reasoning thereof"); *Young v. Group Health Coop.,* 85 Wn.2d 332, 336 n.1, 534 P.2d 1349 (1975) ("[O]ur decision in *Miller v. Kennedy* . . . abandoned the *ZeBarth* case in this regard").

> [T]o bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone. Respect for the patient's right of self–determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves.

*Canterbury v. Spence,* 464 F.2d 772, 784 (D.C. Cir. 1972). The defendants' arguments are not well taken. The duty to disclose arose in this case when Dr. Snyder became "aware of an abnormality which may indicate risk or danger." *Gates v. Jensen, supra* at 251; *Betesh v. United States,* 400 F. Supp. 238 (D.D.C. 1974).

## C
### What Must Be Disclosed

Having determined that the duty to disclose under the doctrine of informed consent had arisen in this case, the extent of the required disclosure must be determined. This depends on the "materiality" of facts concerning the patient's condition—only those facts which an individual would want to know in choosing a course of his treatment need be disclosed. *Miller v. Kennedy,* 11 Wn. App. at 282–83. These facts generally include the risks of a course of treatment and the feasible alternatives to the proposed treatment.[3] It is clear from the discussion of the patient/

---

[3]Contrary to the dissent's assertion that our holding today will require a physician to give "a short course in medicine" to a patient complaining of chest pain,

physician fiduciary relationship that the "treatment" encompasses all aspects of patient care, including the doctor's resolve to do nothing about medical abnormalities in the patient's condition. *See Miller v. Kennedy, supra; Gates v. Jensen, supra.*

In the case at bar, Dr. Snyder's proposed and actual course of treatment constituted no additional tests and conservative prescription drug treatment of two possible sources of Keogan's symptoms. This course of treatment entailed certain risks, *e.g.,* the failure to diagnose a heart condition that Dr. Snyder himself testified he suspected as the cause of Keogan's discomfort. The diagnostic techniques available to establish whether Keogan's chest pain was due to angina and heart disease were feasible alternatives to the proposed course of treatment. Dr. Snyder failed to inform Keogan of either the risks of the treatment undertaken or the alternatives thereto, thus violating the duty to disclose under the informed consent doctrine:

the required disclosure is, of course, much more limited than that. As discussed in this section, the extent of disclosure will depend in part on the symptoms and general physical condition actually presented by the patient. Review of the individual patient's overall condition may all but rule out diseases that might in the abstract be the cause of a symptom or symptoms presented by the patient. The disclosure duty will also depend on the nature and usefulness of diagnostic tests available and on the severity and risks of disease that can be diagnosed thereby. The possibility of life–threatening disease is especially significant, and the duty to disclose will in part be based on the physician's own estimation of the risk and seriousness of a particular disease that is presented by a patient's symptoms or abnormality known to the physician. For instance, in this case, as set forth in greater detail in the text of this opinion, Dr. Snyder testified that he suspected angina as the cause of Keogan's pain. Keogan's symptoms were admittedly consistent with a life–threatening heart condition, a matter that could be of highest urgency. It was essential that the cause of the patient's condition be determined. Under such circumstances, Dr. Snyder's duty would obviously encompass disclosure of the relatively simple, risk–free diagnostic tests available to determine the existence of this life–threatening condition. The existence of these tests were of obvious materiality to the physician *and* to the patient in deciding on a course of treatment. This duty to disclose does not mean that Dr. Snyder would also be compelled to disclose *all* tests available to help diagnose *all* theoretically possible, but nonlife–threatening causes of chest pain regardless of the symptoms and general physical condition actually presented by the patient.

> The existence of an abnormal condition in one's body, the presence of a high risk of disease, and the existence of alternative diagnostic procedures to conclusively determine the presence or absence of that disease are all facts which a patient must know in order to make an informed decision on the course which future medical care will take.

*Gates v. Jensen,* 92 Wn.2d 246, 251, 595 P.2d 919 (1979).

The Court of Appeals attempted in *Keogan* II to distinguish *Gates* because in this case no "simple, inexpensive and risk free" tests could have "conclusively proved" the existence of heart disease. *Keogan* II, 24 Wn. App. 583, 585, 601 P.2d 1303 (1979). Although the fact that alternative diagnostic procedures are "conclusive" or "simple" may be of some importance in determining the materiality of the fact, these characterizations of the tests in *Gates* were not determinative of the doctor's duty to disclose. *Gates* relied on *Miller v. Kennedy,* 11 Wn. App. 272, 522 P.2d 852 (1974), another diagnostic procedure test case which involved neither a simple, risk free, or conclusive means of testing. In addition, two of the tests available in this case, nitroglycerine and treadmill EKG, when considering the alternative of death by heart attack, *were* relatively simple and risk free. The procedures available also provided a high degree of reliability in establishing the existence of an extremely dangerous cause of chest pain.

A general analogy between the alternative diagnostic procedures available in *Gates* and in the instant case will further demonstrate the applicability of the doctrine to Dr. Snyder's failure to disclose the existence of the tests. In *Gates,* the defendant ophthalmologist, upon being presented with borderline readings on preliminary tests for glaucoma, did not inform his patient of the tests available to determine if the abnormality was due to glaucoma, a highly serious, blinding disease. Instead, he treated her for a lesser possible cause of the abnormality—difficulty with her contact lenses. In this case, Dr. Snyder, upon being presented with symptoms of angina and borderline readings

on cardiac enzyme tests for heart disease, did not inform Keogan of the tests available to determine if the condition was due to rapidly progressing heart disease, a highly serious, potentially lethal illness. Instead, he treated Keogan for lesser probable causes of the abnormality—indigestion and mild, drug–controllable angina. The failure to inform of alternative diagnostic procedures, as in *Gates,* violated the duty to disclose within the scope of the doctrine of informed consent. Dr. Snyder was negligent as a matter of law in his uncontroverted failure to inform Keogan of material facts regarding his future medical care. *See Miller v. Kennedy,* 11 Wn. App. at 284–85, 289.

## D
### FAILURE TO GIVE INFORMED CONSENT INSTRUCTIONS

As demonstrated above, it is clear that a physician/patient relationship invoking the doctrine of informed consent with regard to the patient's bodily abnormalities had arisen between Dr. Snyder and Keogan. It is also clear that Dr. Snyder breached that duty by failing to inform Keogan of alternative diagnostic techniques. The trial court's failure to give an informed consent instruction was clearly error.

The plaintiff's proposed informed consent instructions Nos. 8[4] and 21[5] were drafted before this court's decision in

---

[4]Plaintiffs' proposed instruction No. 8 read:

"A physician, before initiating treatment, has a legal duty to obtain the 'informed consent' of his patient. The physician must inform his patient about all material facts, including (1) the nature and probable results of any proposed treatment; (2) any alternative methods of treatment known, or which should have been known, to the physician but about which the patient does not, but should, know; and (3) the risks and anticipated benefits involved in each method of treatment or refusal of treatment. A fact is considered 'material' if a reasonable person would attach significance to it in deciding whether to submit to the proposed treatment.

"A physician's failure to obtain the informed consent of his patient is negligence, rendering the physician liable for injuries proximately caused thereby, even though the particular treatment was administered and performed with that degree of skill and care otherwise required.

"'Proximate cause,' with respect to informed consent, involves two elements: (1) whether a reasonably prudent person in the patient's position would have

*Gates v. Jensen, supra,* and thus could not fully reflect the holding of that case. The instructions were adequate, however, to preserve the plaintiff's contentions under *Miller v. Kennedy, supra,* the direct precursor of *Gates.* Indeed, defendant failed to object to the instructions as proposed.

Under the analysis set forth above, it is clear that Dr. Snyder had breached his duty to disclose material facts to Keogan, and thus proposed instruction No. 8, which set forth the facts necessary to show that the duty to disclose

---

chosen a different course of treatment, or no treatment, had material facts of the proposed treatment, alternative treatment, or no treatment, been made known; and (2) whether the injuries claimed occurred as a result of the treatment to which the patient submitted.

"To prevail on the issue of informed consent, the plaintiffs must establish each of the following elements by a preponderance of the evidence: (1) that one or more of the defendants failed to inform Tim Keogan of the material fact or facts as outlined above; and (2) that Tim Keogan consented to the proposed treatment without being aware of or fully informed of such material fact or facts; and (3) that a reasonably prudent patient in Tim Keogan's position probably would not have consented to the treatment if informed of such material fact or facts; and (4) that the treatment in question caused injury to Tim Keogan.

"If you find that the plaintiffs have established the above elements, then your verdict should be for the plaintiffs. On the other hand, if you find that the plaintiffs have not established the above elements, then you should determine this issue in favor of one or more of the defendants."

[5]Plaintiffs' proposed instruction No. 21 read:

"You are instructed that the court has found as a matter of law that the defendant, Kenneth C. Snyder, M.D., failed to inform the decedent, Timothy W. Keogan, of certain material facts relating to his treatment and alternative of treatment, and you need not consider that issue any further as to this defendant.

"The remaining issues on informed consent which the plaintiffs must establish by a preponderance of the evidence are the following:

"1. Whether a reasonably prudent person in the decedent's position would have chosen a different course of treatment had he been informed of these material facts relating to the treatment or alternatives of treatment; and

"2. Whether the plaintiffs suffered damages as a result of the treatment which the decedent received.

"If you find from your consideration of all the evidence that the plaintiffs have sustained the burden of proof by a preponderance of the evidence on these remaining issues of informed consent, your verdict should be for the plaintiffs and against the defendant, Kenneth C. Snyder. On the other hand, if you find that the plaintiffs have not established the above elements, then you should not consider this issue any further as the the defendant, Kenneth C. Snyder."

has arisen and been violated, was unnecessary.[6] Instead, the court should have given proposed instruction No. 21, which correctly stated that Dr. Snyder "failed to inform the decedent . . . of certain material facts relating to his treatment and alternatives of treatment."

The defendant has not objected to the causation and damages standard set forth in either instruction and proposed instruction No. 21 accurately reflects the requirement of *Miller v. Kennedy,* 11 Wn. App. at 290, that the plaintiff prove "that a reasonable person in the . . . patient's position would not have consented" to the physician's course of treatment. We note that on remand the inquiry will be, not whether Keogan himself would have chosen a different course of treatment, but whether a reasonably prudent person in Keogan's position would have chosen a different course of treatment. *Miller v. Kennedy, supra; Holt v. Nelson,* 11 Wn. App. 230, 523 P.2d 211, 69 A.L.R.3d 1235 (1974). We therefore hold that the trial court erred in refusing to give plaintiffs' proposed instruction No. 21.

### III
### NEGLIGENCE AS A MATTER OF LAW

Plaintiffs next contend that the trial court erred in denying their motion for a partial directed verdict that Dr. Snyder was negligent as a matter of law for failing to rule out the possibility of heart trouble when presented with Keogan's symptoms and that Dr. Appel and Holy Family Hospital were negligent as a matter of law for the failure to give Keogan an EKG when he arrived at the emergency room complaining of mid–chest pain. Plaintiffs' proposed

---

[6]As discussed above, Dr. Appel had no duty of disclosure because of the emergency character of his treatment of Keogan and the apparent immediate need and desire by Keogan that his pain be alleviated as soon as possible. The failure to give proposed instruction No. 8, which would impose a general duty to disclose upon *both* doctors under the requirements of *Miller v. Kennedy,* thus was not error. No duty to disclose on Dr. Appel's part justified the giving of the instruction and, as discussed in the text, plaintiffs' proposed instruction No. 21 adequately set forth the law applicable to Dr. Snyder's duty to disclose.

instructions Nos. 19[7] and 20[8] presented these theories; plaintiffs also object to the trial court's failure to give these instructions.

■ The defendants in medical malpractice cases can be found negligent as a matter of law. As in other tort cases, however, the issue of negligence will be taken from the jury only when no substantial evidence supports the claim that defendants were not negligent. *Shelby v. Keck,* 85 Wn.2d 911, 541 P.2d 365 (1975). Thus, the question in this case is whether the defendants were able to present substantial evidence that they conformed to the standard of medical care required by the circumstances and by the symptoms presented by Keogan. *Hayes v. Hulswit,* 73 Wn.2d 796, 440

---

[7]Plaintiffs' proposed instruction No. 19 reads:

"You are instructed that the court has found as a matter of law that the defendant, Kenneth C. Snyder, was negligent in the treatment of Timothy W. Keogan. Therefore, you are not to concern yourself further with this issue and shall direct your attention to the following remaining issues:

"1. Did the plaintiffs suffer damages as a result of this defendant's negligence;

"2. Was this defendant's negligence a proximate cause of the death of the decedent, Timothy W. Keogan.

"If you find from your consideration of all the evidence that each of these propositions has been proved against this defendant, your verdict should be for the plaintiffs and against this defendant. On the other hand, if any of these propositions have not been proved, your verdict should be for the defendant on this issue."

[8]Plaintiffs' proposed instruction No. 20 read:

"You are instructed that the court has found as a matter of law that the defendant, Anthony J. Appel, was negligent in the treatment of Timothy W. Keogan. Therefore, you are not to concern yourself further with this issue and shall direct your attention to the following remaining issues:

"1. Did the plaintiffs suffer damages as a result of this defendant's negligence;

"2. Was this defendant's negligence a proximate cause of the death of the decedent, Timothy W. Keogan.

"If you find from your consideration of all the evidence that each of these propositions has been proved against this defendant, your verdict should be for the plaintiffs and against the defendant, Anthony J. Appel, and his employer, Holy Family Hospital. On the other hand, if any of these propositions have not been proved, your verdict should be for the defendant on this issue."

P.2d 949 (1968); RCW 4.24.290.[9]

## A

### Dr. Snyder

In order to find Dr. Snyder negligent as a matter of law for his failure to give the tests that would have diagnosed Keogan's heart condition, the plaintiffs would have to show that the applicable medical standard of care compelled him to rule out the possibility of heart disease when presented with a patient with Keogan's symptoms. This inquiry is still necessary despite our conclusion that Dr. Snyder was negligent as a matter of law in violating the duty of disclosure under the doctrine of informed consent. The negligence in treatment is separate and distinct from the negligence in the violation of the physician's duty to disclose material facts. The establishment of the duty to disclose requires no expert testimony; the standard of care is generally established only through the testimony of physicians. *Versteeg v. Mowery,* 72 Wn.2d 754, 435 P.2d 540 (1967). The question of negligence with regard to Dr. Snyder's care of Keogan is whether Dr. Snyder conformed to the medical standard of care in pursuing the course of treatment actually undertaken.

The plaintiffs rely on *Hicks v. United States,* 368 F.2d 626, 629–30 (4th Cir. 1966):

> It would seem . . . that where the symptoms are consistent with either of two possible conditions, one lethal if not attended to promptly, due care demands that a doctor do more than make a cursory examination and then

---

[9]When examining expert medical witnesses, both plaintiffs' and defendants' attorneys often asked what the standard of care "in Spokane in 1972" would have required under the facts of this case. We do not acquiesce in this characterization of the medical standard of care. A medical practitioner is subject to liability "if he fails to exercise that degree of care and skill which is expected of the average practitioner in the class to which he belongs, acting in the same or similar circumstances" regardless of the "locality" of the physician's practice. *Pederson v. Dumouchel,* 72 Wn.2d 73, 79, 431 P.2d 973, 31 A.L.R.3d 1100 (1967). We do not further examine the standard here, however, because of the parties' failure to raise this issue on appeal.

release the patient. . . . The fact that [the lethal condition] is a rare occurrence, and that some [other illness] is the more likely of the two conditions, does not excuse the failure to make inquiries and perform recognized additional tests that might have served to distinguish the one condition from the other.

In *Hicks,* a Navy doctor was found negligent as a matter of law for releasing a patient who later died of an intestinal obstruction. The physician had diagnosed the patient's condition as gastroenteritis. *See also Steeves v. United States,* 294 F. Supp. 446 (D.S.C. 1968) (negligence as a matter of law for failure to keep minor patient under observation after diagnosis of appendicitis); *Kelly v. Carroll,* 36 Wn.2d 482, 494, 219 P.2d 79, 86, 19 A.L.R.2d 1174 (1950) (drugless healer liable for failure to adequately diagnose and treat patient with symptoms of appendicitis. "[I]f there was a possibility that it was appendicitis, [the drugless healer] had no right to gamble with [patient's] life, on the theory that it might be something else.").

Thus, it can be seen that the failure to attempt to diagnose and treat a life–threatening disease can make the physician negligent as a matter of law. These cases can, however, be distinguished from the situation faced by Dr. Snyder. Both *Hicks* and *Steeves* concerned patients presenting "emergency" symptoms of acute, extremely dangerous physical conditions; in *Steeves,* a diagnosis had actually been made. The drugless healer in *Kelly* had been "treating" the patient almost daily for 11 days. Dr. Snyder clearly did not do everything possible to rule out angina and heart disease. However, he was continuing to monitor Keogan's condition in a manner described as consistent with the standard of care in the community by the testimony of two physicians practicing general medicine in Spokane in 1972. Although there was also medical evidence to the contrary, the testimony of the two physicians required that the court leave the issue of negligent treatment to the jury.

This court has never adopted a standard of care that

would always require a physician to always rule out potentially fatal causes of symptoms before proceeding with treatment, regardless of the standard of care in the medical community; the evidence in this case does not support such a holding as a matter of law. A wrong diagnosis is not in itself negligence. *Skodje v. Hardy,* 47 Wn.2d 557, 288 P.2d 471 (1955). There was substantial evidence supporting the view that Dr. Snyder was not negligent. A question of fact as to the culpability of Dr. Snyder's treatment of Keogan was properly presented to the jury in this case, and the trial court did not err in leaving the question of Dr. Snyder's negligence in treating Keogan to the jury or in refusing to give plaintiffs' proposed instruction No. 19.

B

DR. APPEL/HOLY FAMILY HOSPITAL

The Court of Appeals statement in *Keogan* I, 22 Wn. App. 366, 372, 589 P.2d 310 (1979) that:

> Even if . . . the testimony was undisputed that Dr. Appel breached the standard of care in 1972 in not giving an EKG, whether that omission caused further damage to Keogan was disputed by the experts and was therefore a question of fact which was properly submitted to the jury.

is clearly unresponsive to the argument advanced by plaintiffs that the issue of the damages proximately caused by Dr. Appel's treatment of Keogan alone should have been sent to the jury. Plaintiffs' proposed instruction No. 20 *would* have left the issue of damages to the jury. The question instead is whether Dr. Appel breached the standard of care applicable in failing to give an EKG when Keogan arrived at the hospital.

The testimony of all medical witnesses was that administering this test was well within the "degree of skill, care and learning possessed by other persons in the same profession", RCW 4.24.290; all expert medical witnesses testifying on this matter believed that an EKG should, within the standard of care in the medical community, have been

given to an emergency room patient exhibiting Keogan's symptoms of March 6, 1972. Although the defendant, Dr. Appel, testified that he thought he had practiced "good medicine" he did not testify that he had acted in conformity with the applicable standard of care in failing to give an EKG.[10] No evidence raised a disputed issue of fact on the question for the jury's consideration.

The conclusion that Dr. Appel was negligent as a matter of law is further supported by the analysis employed in *Helling v. Carey*, 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974). *Helling* found that defendant doctors were negligent in failing to exercise "reasonable prudence" in administering a pressure test for glaucoma:

> [A]s a matter of law . . . the reasonable standard that should have been followed under the undisputed facts of this case was the timely giving of this simple, harmless pressure test to this plaintiff and that, in failing to do so, the defendants were negligent . . .

*Helling v. Carey, supra* at 519. As in *Helling* and *Gates v. Jensen*, 92 Wn.2d 246, 253–54, 595 P.2d 919 (1979), which affirmed the "reasonable prudence" test of *Helling* within the degree of skill possessed by members of the medical profession, liability was assessed because the defendants' failure to perform a relatively simple test prevented the diagnosis and correction of a severely debilitating disease. That is the case here. The requirement that an emergency room physician administer an EKG in an attempt to rule

---

[10]Dr. Appel was never asked whether an EKG was required by the standard of care. He merely testified as follows:

Q. Do you feel that this conduct on your part during the time that you cared for this man in the emergency room is there any way a derogation of the standard in Spokane then or now?

A. No, I don't—I'm sure that I wouldn't do any different this day.

We agree that, so far as it went, Dr. Appel's treatment of Keogan was consistent with the standard of care. We cannot agree, however, with defendants' contention that this necessarily meant that nothing *else* was required from Dr. Appel. He did not testify, and no other medical witnesses testified, that an EKG was not required under the circumstances of this case. Dr. Appel's *omissions*, not his *commissions*, violated the applicable standard of care.

out heart attack as the cause of mid–chest pain in a middle–aged man who was rushed by ambulance to the hospital in the middle of the night can be imposed as a matter of law in a case such as this, where testimony was uncontroverted that an EKG was medically indicated. There was testimony that in 95 percent of the cases it would have shown the type of infarction that actually killed Keogan. We therefore hold that the trial court erred in denying plaintiffs' motion for a partial directed verdict that Dr. Appel and Holy Family Hospital were negligent as a matter of law and in refusing to give plaintiff's proposed instruction No. 20.

We reverse the Court of Appeals and remand the case for further proceedings consistent with this opinion. On remand, trial will be necessary only on the issue of the damages that may have been proximately caused by Dr. Snyder's failure to inform Keogan of alternative diagnostic techniques and by Dr. Appel's failure to administer an EKG and thus earlier diagnose Keogan's condition.

UTTER, C.J., and HANLEY, J. Pro Tem., concur.

HICKS, J. (concurring in part, dissenting in part)—As has been said, the "retrospectroscope" of hindsight is an infallible method of diagnosis, but unfortunately it is not available at the time the patient is first seen. By the use of this infallible method, the majority diagnoses heart disease as existing in Timothy Keogan when he was seen by Dr. Kenneth Snyder in mid–February 1972.

By thereafter focusing on the diseased heart to the exclusion of everything else, the majority seizes upon a suspicion by Dr. Snyder of a possibility that Keogan may have had angina pectoris to decree that the informed consent doctrine as applied in *Gates v. Jensen,* 92 Wn.2d 246, 595 P.2d 919 (1979), controls here. In *Gates,* the court held that a physician has a duty of disclosure whenever he becomes aware of a bodily abnormality which may indicate risk or danger, whether or not the diagnosis has been completed.

The Court of Appeals held that no duty to inform had yet arisen in this case because when "there is no diagnosis nor diagnostic procedure involving risk to the patient, there is nothing the doctor can put to the patient in the way of an intelligent and informed choice." *Keogan v. Holy Family Hosp.*, 22 Wn. App. 366, 370, 589 P.2d 310 (1979). Under the circumstances of this case, I agree with the Court of Appeals.

In the course of two office calls within a 2–week period, Dr. Snyder had become aware of no bodily abnormality in his patient. A suspicion of a possibility of an abnormality (angina pectoris) hardly seems sufficient to trigger, as a matter of law, a duty to inform a patient of tests that could be given to diagnose the severity of such an evanescent bodily abnormality. By this opinion, this court establishes, as a matter of law, a medical standard in this state that a patient complaining to his doctor of chest pain must be given a short course in medicine—in heart disease and everything else that could cause chest pain.

Angina pectoris did cross Dr. Snyder's mind as a possible cause of Keogan's chest pain. After taking a history and examining Keogan, however, the doctor settled upon costochondritis as a probable cause of the chest pain.

E. Goldberger in his text *Heart Disease* (Lea & Febiger 1951), in the chapter on "The Anginal Syndrome," has this to say at page 248:

C. Noncardiac disease may simulate the symptoms of angina pectoris. Some of the more common noncardiac conditions that may cause substernal or precordial pain are the following: [Eleven conditions are discussed.]

1. Lesions of the Cervical or Thoracic Vertebrae. . . .
2. Subdeltoid Bursitis, Periarthritis, or Fibrositis of the Left Shoulder. . . .
3. The Scalenus Anticus Syndrome. . . .
4. Slipping Rib Cartilage Syndrome. . . .
5. Herpes Zoster of the Intercostal Nerves. . . .
6. Hiatus Hernia of the Stomach. . . .

7. Esophageal Diverticula. . . .
8. Cardiospasm. . . .
9. Ulcers of the Esophagus, Stomach or Duodenum . . . [chronic gall bladder pain listed also].
   10. Mediastinal Emphysema. . . .
   11. Diaphragmatic Flutter. . . .

The above lists only the common noncardiac conditions that may cause chest pains. Costochondritis, an inflammation of the cartilage connecting the ribs to the sternum, a condition Dr. Snyder diagnosed as a probable cause of Keogan's chest pain apparently is another noncardiac condition causing such pain. At trial in this case, one doctor testified that 200 different things might cause chest pain, only 3 of which related to the heart.

If Dr. Snyder was negligent because he should have discovered Keogan's diseased heart and failed to do so, that is what should be alleged and proved in this case. It was alleged. The jury did not find that it was proved. This court with its benefit of hindsight should not now enter the fray on the plaintiffs' side with rulings as a matter of law as to what the doctor should have told the patient.

It is common knowledge that the cost of medical attention is escalating, seemingly at an ever increasing rate. As this court dictates what doctors must do to protect themselves in malpractice actions, it adds to that escalation. Aside from higher costs, however, the utilization of comparatively scarce medical resources to conduct tests whose primary if not sole purpose is to provide a defense to a court action is simply a social waste. Yet, that is exactly what the majority opinion may foster.

As to the emergency room doctor and his employer, Holy Family Hospital, I would prefer to leave the matter of their negligence to the jury. Since, however, the majority has determined that the evidence supports finding negligence as a matter of law for failure to administer an electrocardiogram to Keogan upon his presentation at the

hospital emergency room, I concur in that part of the majority opinion.

ROSELLINI, STAFFORD, BRACHTENBACH, and DOLLIVER, JJ., concur with HICKS, J.

Reconsideration granted April 9, 1981.

Cause dismissed by stipulation of parties June 23, 1981.