[Nos. 39005-8-I; 41399-6-I.    Division One.    April 13, 1998.]

ROBERT J. GUSTAV, ET AL., *Appellants*, v. SEATTLE
UROLOGICAL ASSOCIATES, ET AL., *Respondents*.

BECKER, J., dissents by separate opinion.

*David J. Balint* of *DeFunis & Balint, P.S.*; *Jeffrey C. Mirsepasy*; and *Gary J. Taylor,* for appellants.

*Thomas H. Fain, Margaret A. Sundberg*, and *Mary H. Spillane* of *Williams, Kastner & Gibbs, L.L.P.*, for respondents.

AGID, A.C.J. — Robert J. Gustav, a 75-year-old man suffering from incurable metastasized prostate cancer, filed this action for medical malpractice against Dr. James Gottesman and his partner, Dr. Joel Lilly, alleging that Dr. Gottesman negligently failed to diagnose his cancer until April 1994 after another doctor in California did a bone scan that revealed the presence of cancer in his spine, ribs and scapula. Gustav appeals the trial court's summary dismissal of his informed consent claim. Because Gustav stated a claim for negligence, not informed consent, the trial court properly granted summary judgment and we affirm.

## FACTS

Gustav first saw Dr. Gottesman on June 22, 1987, for a suspicious nodule in his prostate and an elevated PSA.[1] He reported a history of prostatitis and a January 1987 PSA level of 20.3. Although another doctor recommended a biopsy in September 1985, the one Dr. Gottesman performed was Gustav's first. The pathology report reflected some abnormality in the cells lining the prostate consistent with

---

[1]PSA is a molecule produced only by the prostate and normally found only in very small amounts in the blood. Greater amounts of PSA in the blood indicate conditions or events affecting the prostate.

a history of prostatitis but did not reveal the presence of any malignancy or cancer. Two of the four samples obtained during the biopsy were of marginal diagnostic value, but Dr. Gottesman was satisfied with the result, especially when the PSA report he ordered reflected a slight drop to 20.1.

Dr. Gottesman continued to examine Gustav for prostate cancer over the next six years. During that time, Gustav's PSA level was tested over 20 times by Dr. Gottesman and sometimes by other physicians that Gustav was also seeing, i.e., about three times a year. A high PSA level is not specific to cancer; men with a normal PSA may have cancer, and other conditions such as prostatitis can cause a high PSA.[2] But Dr. Gottesman began using PSA testing when it became available to learn what he could from it. At the time, PSA testing was generally regarded as a good measurement of the effectiveness of cancer treatment, but its use to detect cancer was still controversial. The FDA did not certify PSA testing for cancer screening until August 1994, several months after Gustav's cancer was diagnosed. Although the various PSA tests Dr. Gottesman ordered between 1987 and 1994 reflected elevated PSA levels, Dr. Gottesman believed these were caused by Gustav's long history of prostatitis.

In 1991, Dr. Gottesman noted some changes in the appearance of the prostate and arranged for his partner, Dr. Lilly, to biopsy the areas he felt were suspicious. Dr. Lilly had to stop before biopsying all the areas he had planned to cover because Gustav was in pain from the procedure. But he was able to biopsy the suspicious areas in the left base and left mid-gland. The biopsy was negative, and Dr. Gottesman concluded that it was not necessary to rebiopsy. Over the course of the next two years, Gustav continued to experience urologic symptoms and elevated PSA levels which Dr. Gottesman believed were caused either by his chronic prostatitis or by an episode of bacterial infection. In June 1993, Gustav's PSA level rose to 31.2, but it had

---

[2]Seventy percent of men with elevated PSA levels do not have prostate cancer.

dropped again to 23.1 by December 1993. Because that pattern was consistent with what Dr. Gottesman had observed throughout the time he had been treating Gustav, he continued to believe it did not indicate he had cancer.

The last time Dr. Gottesman saw Gustav before his cancer was detected, he reported that pain in his right groin from twisting a muscle playing golf was improving with physical therapy. Because cancer-related pain would not have responded to physical therapy, Dr. Gottesman again did not attribute it to cancer. Dr. Gottesman also did not regard either a February 27.3 PSA test result Gustav reported from California or the fact that Gustav's flow tended to decrease after he ate salty food as cause for concern. In his clinical judgment, both were consistent with Gustav's long history of prostatitis, and he did not consider a biopsy at that time.

On April 6, 1994, Gustav called Dr. Gottesman from California and reported he had undergone a bone scan which revealed the presence of metastatic cancer in his bones. When Dr. Gottesman examined Gustav in Seattle on April 11, his PSA level was 57.6. A biopsy revealed the presence of cancer in the left base and mid-gland and a lesser amount of cancer in the left apex, the areas that had previously appeared suspicious to Dr. Gottesman. When the pathology report came back, Dr. Gottesman met with Gustav and his family. He told them there was prostate cancer and that he had been mistaken in regarding Gustav's 20-year history of prostatitis as the sole cause of his elevated PSA levels.

In December 1994, Gustav filed this action against Dr. Gottesman and Dr. Lilly. In February 1996, Gustav moved for partial summary judgment on his claims for negligence and informed consent. Drs. Gottesman and Lilly cross-moved for summary judgment on the ground that Gustav's informed consent claim was subsumed in his negligent failure to diagnose claim. On April 18, 1996, the trial judge granted the doctors' motion and dismissed the informed consent claim.

Trial began on May 20, 1996. On June 6, the jury returned its verdict for Drs. Gottesman and Lilly. Gustav moved for a new trial. The trial court denied the motion and entered judgment on the verdict. Gustav appealed.

## DISCUSSION
### Informed Consent Claim

■■ Gustav contends that the trial court erred when it dismissed his informed consent claim on summary judgment. In reviewing a summary judgment order, we engage in the same inquiry as the trial court. Summary judgment should be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[3]

■■ Summary judgment was proper here because, as a matter of law, Gustav's allegations involved negligence prior to treatment, not informed consent concerning a treatment the doctor proposed to use. These are two distinct causes of action. Allegations supporting one normally will not support the other. Both Gustav's negligence claims and his informed consent claim were based on Dr. Gottesman's failure to diagnose his prostate cancer. Gustav alleged that Dr. Gottesman was negligent in "[f]ailing to order diagnostic tests as frequently as appropriate" and "[f]ailing to order completion of the 1991 biopsy for the four areas of the prostate gland not tested by giving the appropriate anesthesia to the plaintiff." His informed consent claim similarly alleged that Drs. Gottesman and Lilly "failed to fully inform [him] of the appropriate frequency of diagnostic testing, the dangers involved in not testing more frequently, and the consequences of not

---

[3]*Mountain Park Homeowners Ass'n, Inc. v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). We may affirm an order granting summary judgment on any basis supported by the record. *Hadley v. Cowan*, 60 Wn. App. 433, 444, 804 P.2d 1271 (1991).

completing the 1991 biopsy."[4] Nothing in these allegations relates to a failure to warn of potential consequences of treating Gustav's cancer, a condition he could not have treated because he failed to diagnose it.

While a physician has a duty to disclose an abnormality in the patient's body which may indicate risk or danger,[5] a physician's failure to diagnose a condition is a matter of medical negligence, not a violation of the duty to inform.[6] The duty to disclose does not arise until the physician becomes aware of the condition by diagnosing it.[7] Informed consent and medical negligence are alternate methods of imposing liability.[8] Whether Drs. Gottesman and Lilly misjudged "the appropriate frequency of diagnostic testing, the dangers involved in not testing more frequently, and the consequences of not completing the 1991 biopsy," i.e., whether they negligently failed to diagnose Gustav's cancer, are issues that implicate negligence in diagnosis falling below the standard of care, not informed consent about the risks of treating the diagnosed condition.[9]

This is true even of Dr. Gottesman's failure to inform

---

[4]In his answer to an interrogatory asking him to identify each wrongful or negligent act they alleged, Gustav similarly listed "[f]ailure to disclose to Mr. Gustav the risk of not obtain[ing] frequent biopsies and other test[s] to determine the presence of prostate cancer" and "[f]ailure to disclose to [Mr.] Gustav that obtaining only 2 samples during the [1991] biopsy was insufficient to properly test for prostate cancer and that additional biopsies should be taken." These are diagnostic tests, not treatment for a diagnosed condition.

[5]A physician has a duty to disclose the risks of proposed treatment before obtaining a patient's consent for treatment. *Smith v. Shannon*, 100 Wn.2d 26, 29, 666 P.2d 351 (1983). A physician does not have a duty to explain all risks, only those of a material nature. *ZeBarth v. Swedish Hosp. Med. Ctr.*, 81 Wn.2d 12, 25, 499 P.2d 1, 52 A.L.R.3D 1067 (1972). The informed consent form Gustav signed stated that biopsies could be inconclusive for the presence or absence of malignancy.

[6]*Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 261, 828 P.2d 597, *review denied*, 119 Wn.2d 1020 (1992); *Bays v. St. Luke's Hosp.*, 63 Wn. App. 876, 881, 825 P.2d 319, *review denied*, 119 Wn.2d 1008 (1992).

[7]*Bays*, 63 Wn. App. at 881; *Burnet v. Spokane Ambulance*, 54 Wn. App. 162, 772 P.2d 1027, *review denied*, 113 Wn.2d 1005 (1989).

[8]*Thomas*, 65 Wn. App. at 261; *Burnet*, 54 Wn. App. at 168.

[9]*Miller v. Kennedy*, 11 Wn. App. 272, 522 P.2d 852 (1974), on which the dissent relies for its position to the contrary, is distinguishable. In that case, the

Gustav that he was not initially aware of the different assays used to report PSA test results. Despite that difference, Gustav was still aware that his PSA levels were elevated, that they tended to go up and down, and that they were gradually increasing. The overall pattern was apparent from the test results even as reported by Dr. Gottesman.[10] The problem was that Dr. Gottesman misdiagnosed the *reason* for that pattern. He believed that Gustav's chronic prostatitis or a bacterial infection caused it, not cancer.[11] Even after he learned of the need to convert the PSA test results, Dr. Gottesman maintained the same conviction about the reason for the PSA levels. The question whether Dr. Gottesman should have known of the difference between the two assays earlier and whether he unreasonably failed to recognize the significance of the pattern he observed raised the question of negligence and the applicable standard of care, not informed consent. If Dr. Gottesman never became aware of the condition and should have, he was negligent. But there was no allegation that he failed to disclose a material fact related to treating that condition. To hold otherwise would be to merge two distinct

plaintiff brought claims for negligence and informed consent after a kidney biopsy resulted in the loss of his kidney. The first claim was premised on the physician's alleged negligence in performing the biopsy itself; the second claim was premised on the failure to warn about the risks inherent in the biopsy procedure. While a single biopsy may support claims for both negligence and informed consent, *Miller* does not stand for the proposition that an informed consent claim may be premised on a physician's failure to warn that the procedure may not be completed and, if not, what that would mean. There is a difference, which the dissent blurs, between warning about risks of which a physician knows and a physician's failure to warn of risks about which he does not know because he has misdiagnosed the patient's condition. Here, Gustav's arguments that Gottesman knew he was at risk for cancer all reinforce a claim for negligence in failing to conduct adequate tests, but is still negligence and not a failure of informed consent.

[10]In our view, the dissent significantly mischaracterizes the differences between the two PSA results. The *pattern* was apparent regardless of the scale that was used.

[11]*Estate of Lapping v. Group Health Coop.*, 77 Wn. App. 612, 892 P.2d 1116 (1995), on which Gustav relies for his argument that the duty to inform is implicated where a misdiagnosis occurs, is not on point. In *Lapping*, where the plaintiff's decedent died while undergoing a diagnostic procedure, the court considered a physician's duty to inform regarding risks inherent in the diagnostic procedure itself.

and logically separate causes of action. The trial court properly dismissed the informed consent claim.[12]

Affirmed.

A majority of the panel having concluded that the remainder of this opinion lacks precedential value, it is ordered that only the foregoing will be published. The balance of the opinion shall be filed for public record as provided in RCW 2.06.040.

COLEMAN, J., concurs.

BECKER, J. (dissenting) — I respectfully dissent. I would hold appellant Bob Gustav stated and factually supported a claim that his physician failed to inform him of facts material to his treatment.

Early in 1987, Gustav learned he was at risk of prostate cancer. A suspicious nodule was found during a digital rectal examination, and he had an elevated score in a Prostate-Specific Antigen (PSA) blood test. Gustav, then 65 years old, consulted Dr. Gottesman. Dr. Gottesman initially thought it was probable that cancer would be found, and ordered a biopsy. The biopsy was negative for cancer. Dr. Gottesman did not inform Gustav that the biopsy measured fewer areas than he had intended.

In view of the negative biopsy, Dr. Gottesman diagnosed Gustav's symptoms as manifesting prostatitis, not cancer, though he continued to monitor his PSA level and to send the lab reports to Gustav. PSA levels were being reported in two different scales depending on which lab did the testing. According to the declaration of Dr. Palken submitted by Gustav in defending the motion for summary judgment, Dr. Gottesman did not realize values reported by different labs needed to be converted in order to be comparable, and consequently he did not have accurate information with which to track Gustav's PSA levels. On occasion, he reported to Gustav his PSA levels were falling when actu-

[12]See, e.g., Bays, 63 Wn. App. at 881.

ally they were rising. Notably, Gustav's PSA level increased by 50 percent between August and September 1989, but Dr. Gottesman reported to Gustav that it had fallen. By sending Gustav copies of the lab reports displaying absolute values and reassuring him that they represented falling levels, Dr. Gottesman demonstrated his own belief in the significance of PSA levels. Yet, in 1991 when Dr. Gottesman became aware that he had misinterpreted the lab reports, he did not inform Gustav about it.

Later in 1991, Dr. Gottesman, noting a changing appearance in the prostate, ordered another biopsy. His partner, Dr. Lilly, performed the biopsy, but stopped early when it became painful to Gustav. The biopsy was negative for cancer. Dr. Gottesman told Gustav that he was satisfied with the biopsy because even though they did not take as many tissue samples as planned, they did take samples from the most suspicious areas. Dr. Gottesman did not inform Gustav that Dr. Lilly had written on his note, "Appropriate biopsies could not be completed."[13]

The majority opinion holds as a matter of law that Gustav's allegations "involved negligence prior to treatment, not informed consent concerning a treatment the doctor proposed to use."[14] I disagree. The majority's characterization of Gustav's cause of action overlooks Gustav's memorandum responding to the defendants' motion for summary judgment in which he put his informed consent claim squarely at issue:

> It goes without question that, had Mr. Gustav known his PSA was rising instead of staying the same, he would have asked what else could have been done, or if an additional biopsy should have been performed. He could have gotten a second opinion. Had Mr. Gustav been told that *both* of the biopsies were flawed, he would have asked that they be completed and/or performed again.

---

[13]Dr. Lilly qualified this observation in deposition, saying that on the whole he felt the patient had an adequate evaluation. But on summary judgment we must construe all inferences in favor of Gustav, the nonmoving party, and an available inference is that Dr. Lilly would have recommended doing another biopsy.

[14]Majority at 789.

The majority places this case within the rule that "a physician's failure to diagnose a condition is a matter of medical negligence, not a violation of the duty to inform."[15] But here, Gustav is not invoking Dr. Gottesman's duty of care in making a diagnosis. He is invoking Dr. Gottesman's duty to provide complete information about the PSA levels and the biopsies in order to enable Gustav to intelligently choose the course of his own medical care.[16]

The majority relies on *Bays v. St. Luke's Hospital*,[17] in which the court held that "the duty to disclose does not arise until the physician becomes aware of the condition by diagnosing it." The court rejected the plaintiffs' argument that the physician's failure to diagnose a life-threatening condition was actionable both as a violation of the standard of care and as a violation of the duty to disclose the risks and methods of treatment for the undiagnosed condition. By contrast, Gustav is not arguing that Dr. Gottesman breached a duty to disclose a diagnosis the doctor had not yet reached. He is arguing the doctor breached a duty to disclose facts material to Gustav's belief that no additional biopsies were necessary.

A health care provider may become liable for breaching a duty to obtain informed consent if the provider fails to "inform the patient of a material fact or facts relating to the treatment."[18] Failure to obtain informed consent is itself a form of negligence because it breaches a duty of due care to alert the patient to abnormalities in his body.[19] The doctor's duty to inform the patient is a fiduciary duty, arising from the relationship of trust and the physician's recognition of the patient's ignorance and helplessness regard-

---

[15]Majority at 790.

[16]*See Gates v. Jensen*, 92 Wn.2d 246, 250, 595 P.2d 919 (1979).

[17]*Bays v. St. Luke's Hosp.*, 63 Wn. App. 876, 881, 825 P.2d 319, *review denied*, 119 Wn.2d 1008 (1992); *see also Burnet v. Spokane Ambulance*, 54 Wn. App. 162, 168, 772 P.2d 1027, *review denied*, 113 Wn.2d 1005 (1989).

[18]RCW 7.70.050(1)(a).

[19]*Miller v. Kennedy*, 11 Wn. App. 272, 282, 522 P.2d 852 (1974).

ing his own physical condition.[20] The duty to disclose material facts arises as "to each item of information which the doctor knows or should know about the patient's physical condition."[21] The scope of the duty to disclose is "the reasonably foreseeable risk to the patient of a proposed course of treatment."[22]

Applying these legal rules to the present case, Dr. Gottesman was aware that Gustav's condition strongly suggested cancer. After the first biopsy came back negative, he diagnosed the condition as prostatitis. From then on, Dr. Gottesman's treatment was to diagnose and treat prostatitis, while continuing to monitor for new signs of cancer. He continued with the same course of treatment after doing a second biopsy which also came back negative. This course of treatment, because it depended on the accuracy of the PSA levels and the adequacy of the biopsies, presented a foreseeable risk to the patient if the PSA levels were inaccurately tracked and the biopsies were incomplete. A jury could thus find that Dr. Gottesman breached his duty to disclose material facts when he failed to inform Gustav of the errors in the information underlying Gustav's consent to a course of treatment involving no additional biopsies. The nondisclosure deprived Gustav of the choice to seek additional biopsies or a second opinion from a physician better informed about how to interpret PSA tests.

Under *Miller v. Kennedy*,[23] the scope of the duty to disclose information concerning the risk of a course of treatment is measured by the patient's need to know information necessary to an intelligent choice. It is "the prerogative

---

[20]*Miller v. Kennedy*, 11 Wn. App. at 282.

[21]*Id.; quoted in Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 315, 622 P.2d 1246 (1980).

[22]*Keogan v. Holy Family Hosp.*, 22 Wn. App. 366, 369, 589 P.2d 310 (1979). On appeal to the Supreme Court, the Court of Appeals analysis of the informed consent issue was cited with approval by Justice Hicks' concurring/dissenting opinion, in which he was joined by four other members of the Supreme Court. *Keogan*, 95 Wn.2d at 330.

[23]*Miller v. Kennedy*, 11 Wn. App. 272, 282-83, 522 P.2d 852 (1974).

of the patient" to choose his course of treatment.[24] The inquiry is whether "the patient as a human being" would consider the item in choosing his or her course of treatment.[25] Once the plaintiff has established a prima facie case of failure to disclose, the burden shifts to the physician to prove a defense by explaining the reasons for not providing the information.[26]

The defendants' only argument in moving for summary judgment was that Gustav's informed consent claim was completely subsumed under his negligence theory. I would hold Gustav established a distinct prima facie case of breach of the duty to disclose. Dr. Gottesman's explanation, that he did not need to tell Gustav about the erroneous PSA readings or the flaws in the biopsies because these items were not significant to his diagnosis, is a defense. It does not negate the plaintiff's cause of action.

I would reverse and remand for trial on the issue of informed consent.

Review denied at 136 Wn.2d 1023 (1998).