Peter M. MADSEN, individually and as Parent and Natural Guardian of Justin R. Madsen, Respondent,

v.

PARK NICOLLET MEDICAL CENTER, Park Region, f.k.a. St. Louis Park Medical Center, et al., petitioners, Appellants.

Nos. C1–87–1150, C0–87–1639.

Supreme Court of Minnesota.

Nov. 23, 1988.

Robert E. Salmon, Thomas L. Adams, Minneapolis, for appellants.

Lee R. Bissonnette, Jeffrey W. Lambert, Wayzata, for respondent.

KELLEY, Justice.

The primary issue this appeal presents is whether the negligent nondisclosure rule,

which had its genesis in *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn.1977), is applicable in a medical malpractice case in which the claim of negligent nondisclosure is based on the alleged failure of the attending physician to inform the patient of the availability of additional, as distinguished from alternate, treatment, and the risk associated with not accepting the additional treatment. The trial court declined to give a requested jury instruction, which, if given, would have imposed upon the attending physician the duty to so inform the patient. On appeal following entry of judgment, the court of appeals reversed and remanded for a new trial. *Madsen v. Park Nicollet Medical Center*, 419 N.W.2d 511, 515 (Minn.App.1988).[1] We reverse and remand to the trial court for re-entry of judgment.

Respondent Peter Madsen, individually and on behalf of his son, Justin Madsen, commenced this action against Dr. Norman Solberg and Park Nicollet Medical Center.[2] His complaint alleged that the doctor, a member of the medical center, negligently rendered treatment to Robin Madsen, Justin's mother, during pregnancy by not insisting that Robin undergo hospitalization three days before Justin's premature birth on January 1, 1983. Respondent's complaint also alleged that Dr. Solberg negligently failed to disclose the risks of premature labor were Robin not then hospitalized. Respondent sought damages for severe and permanent disabilities Justin had sustained, allegedly resulting from the asserted negligence.

At trial the issues of both negligence and causation were vigorously disputed. Not only did the evidence demonstrate critical factual disparities between the evidence of the Madsens and that of the doctors with respect to Mrs. Madsen's care during her pregnancy, but it also revealed to the jury conflicting professional opinions regarding the appropriate standard of care to be employed in the course of treating one in Mrs. Madsen's circumstances, as well as whether Jason's injuries were caused by any purported negligence during the course of treatment. The jury resolved those evidentiary disputes by finding the absence of any causal negligent treatment. The trial court entered judgment on the verdict in favor of the appellants.

In post-trial motions respondent asserted that the jury's findings with respect to both negligent treatment and causation were unsupported by competent evidence. Additionally, he argued that the trial court erred by refusing to give a requested jury instruction regarding negligent nondisclosure duties of an attending physician which incorporated an obligation upon a physician to advise of the availability of additional as well as alternative treatment. On appeal from the trial court's order denying those motions, the court of appeals panel held sufficient competent evidence existed to support the jury's verdict finding absence of causal negligence in the treatment and care of Robin Madsen during her pregnancy.[3] However, it remanded the case for a new trial at which the respondent would be entitled to have its proffered instruction submitted to the jury.

The incidents giving rise to this litigation commenced the latter part of September 1982, when Dr. Norman Solberg of the Park Nicollet Medical Center diagnosed

---

1. The court of appeals panel purported to hold that the negligent nondisclosure rule did apply to a case concerning *additional* as well as alternate treatment. *Madsen*, 419 N.W.2d at 514–15. However, seemingly, it went on to hold that this case, in fact, concerned alternative treatment. *Id.* at 515. For reasons set forth in the text, we reject both conclusions.

2. Originally, Dr. Mario Petrini, another physician associated with a medical center, was also named as a defendant. Following the verdict, however, the respondent abandoned all claims against Dr. Petrini, and, accordingly, he no longer remains a party.

3. The court of appeals also sustained trial court evidentiary rulings which respondent had challenged. Since respondent failed to serve and file the notice of review required by Rule 106, Civil Appellate Rules, neither the sufficiency of the evidence nor the evidentiary issues are before us.

Robin Madsen, who had experienced two prior successful pregnancies ultimately terminated by Caesarian section, to be again pregnant. At that time and during the succeeding two months, she experienced intermittent vaginal bleeding ending approximately November 1. When Mrs. Madsen later experienced a heavy watery discharge on November 30, Dr. Solberg referred her to Methodist Hospital where nitrazine tests were performed to determine the presence of amniotic fluid. The initial nitrazine test taken at the hospital proved to be negative, but a later test result was equivocal. The hospital on-call doctor discussed with Mrs. Madsen the desirability of hospitalization, but she refused and returned to her home.

The following day Mrs. Madsen saw Dr. Solberg in his office at which time the leaking of the previous night was discussed. He then advised her to refrain from sexual intercourse, douching, and to generally "take it easy." At her next visit two weeks later, Robin Madsen related to nurse practitioner Shirley Dixon continued complaint of "leaking." [4] Nurse Dixon ordered another ultrasound test, conducted on December 22, which indicated the presence of a normal amount of amniotic fluid.[5] A nitrazine test on this occasion was again negative for the presence of amniotic fluid.

On December 29 Mrs. Madsen was again seen in his office by Dr. Solberg. On that date, for the first time, a nitrazine test resulted in a positive reading indicating the presence of amniotic fluid in the vaginal discharge. What further transpired at that consultation is in dispute. Dr. Solberg contends that hospitalization was discussed. His records made contemporaneously with Mrs. Madsen's visit, corroborate his contention. His further assertions made at trial that, considering the circumstances then existing, he would have mentioned the possibility of premature labor, however, was not corroborated by the entry on the medical record card.[6]

Robin Madsen and her husband at trial related a different version of what occurred at that visit. They asserted that initially Nurse Dixon had seen them because Dr. Solberg was busy, but that after the nitrazine test was positive, Nurse Dixon left the examination room after which Dr. Solberg came in. Since the customary practice was for Nurse Dixon to see the patient on alternate visits, and since she had examined Mrs. Madsen on the previous visit, Nurse Dixon said she would not have seen Mrs. Madsen on this occasion. Nurse Dixon further testified she "charts" during the course of her examination and that therefore the medical chart would have revealed her presence on that day had she been present. The Madsens also claim that they asked Dr. Solberg if they could travel to Morris, a city approximately 150 miles west of the metropolitan area, to attend a family New Year's Eve gathering and that Dr. Solberg consented to the trip providing they stopped whenever Robin Madsen had

---

**4.** On visits to the medical center for bi-weekly maternal checkups, Mrs. Madsen was seen alternately by Dr. Solberg and Nurse Dixon. On her visit on December 15 she was seen by Nurse Dixon.

**5.** Ultrasound is a test employed to aid prenatal diagnosis to detect the presence of anatomical abnormalities. The first ultrasound test was conducted in September.

**6.** The entry on the medical record card read: Again, states that she is leaking some watery fluid per vagina which she says is like what she has had for the past month or two. On vaginal exam today there is a pool which is definitely nitrazine positive. She has had no fever, chills, generally otherwise feels quite well. Repeat ultrasound exam shows approximately 22 weeks gestation and she was felt to have a normal appearing quantity of amniotic fluid. By her previous dates at the time of that ultrasound she should have been just over 24 weeks so there was about a two week discrepancy.

*Discussed possible hospitalization at this time but since she has been* leaking from 1–2 months and is feeling quite well, she will go home, rest, avoid intercourse or anything else in the vagina, take her temperature regularly, and come in promptly if she develops any fever or is feeling sick at all. Recheck one week.

(Emphasis supplied).

to go to the bathroom. Considerable doubt was cast upon the correctness of the Madsens' recollection by (1) the fact the alleged conversation and permission was uncharted, as well as, (2) that their claim Dr. Solberg told them to stop when Robin felt the need to go to the bathroom, as Dr. Solberg testified at trial, made no medical sense, and directly conflicts with the advice given Robin which was charted in the medical record.

The Madsens did travel by automobile to Morris on December 31. Shortly after arrival there, Robin began to experience pains and cramps. She talked by long distance telephone with Dr. Petrini who also was associated with the Park Medical Center. Robin testified that Dr. Petrini advised only that she lie down and rest. Dr. Petrini claims he urged her to go to the emergency room of the Stevens County Hospital in Morris. In any event, she did not go to the hospital that night.

About noon the next day Robin Madsen discovered that she was bleeding heavily. She then had her husband and father-in-law take her immediately to the Morris hospital. The hospital at Morris is classified as a level one hospital meaning that it has no neonatal care units. Neonatal units employ special equipment and staff to render specialized care of premature infants. Those units are found in institutions classified as third level hospitals. No third level hospitals exist in, or in the area immediately surrounding, Morris.

On admission to the Morris hospital, it was determined that during this approximately 26th week of pregnancy, Mrs. Madsen had experienced an abruption placenta, a separation of the placenta from the uterine wall. Because this condition created an emergency portending premature delivery by Caesarean section with the attendant desirability of employing the neonatal care and treatment available at a third-level hospital, the Morris Hospital physician attempted to arrange for an air ambulance to transfer Robin Madsen to a hospital possessing those facilities in either Minneapolis or Fargo, North Dakota. That attempt proved unsuccessful.

His inability to immediately secure an air ambulance combined with the emergency created by the abruption and the resulting extensive bleeding mandated that Justin be prematurely delivered by Caesarean section. Thirty minutes after the delivery an emergency team arrived at the Morris hospital from Fargo, and shortly thereafter the newly born child was transported to a third-level hospital. Nonetheless, Justin suffers from multiple defects including blindness in one eye, spastic quadriplegia, cerebral palsy, brain damage, neurological disorder, and significant impairment of his motor and cognitive skills.

Since respondent did not seek review of the ruling of the court of appeals panel that sufficient evidence supported the jury's verdict finding the absence of causal negligence, that issue is not before us. But in addition to alleging negligent treatment, the respondent has asserted that Dr. Solberg negligently failed "to properly advise plaintiff patient of the risk of not being hospitalized given her medical history and condition on December 29, 1982." In support of that allegation, respondent submitted a requested jury instruction on informed consent/negligent nondisclosure which was a modified form of Minnesota Jury Instruction Guides (JIG) 427.1.[7] The modified proffered instruction differed

7. The respondent's proposed instruction would have informed the jury that a physician had a duty to disclose to his patient not only certain risks of treatment and of alternative treatment, but as well a "nontreatment." It then continued:

A physician is negligent in failing to obtain informed consent from a patient or in failing to disclose the risks of treatment if the following five elements are proved:

(1) The physician knew or should have known of the risk involved in the treatment rendered or in *nontreatment.*

(2) The risk of treatment rendered *or of nontreatment* was significant enough that the physician should have told his patient of it. A risk of treatment *or nontreatment* is significant if the physician knew or should have known that it would be regarded as significant by a reasonable person in the patient's

mainly from the JIG instruction 427.1 by addition of words that would have authorized a finding of negligence had the physician failed to warn against any risk associated with "nontreatment." In denying the requested instruction, the trial court relied on *Kalsbeck v. Westview Clinic, P.A.*, 375 N.W.2d 861 (Minn.App.1985). (Pet. for Rev. Denied (Minn. Dec. 30, 1985)).[8]

■ In the instant case, the court of appeals panel acknowledged the prior holding of *Kalsbeck*. It further acknowledged that this court subsequently had cited *Kalsbeck* as defining the general parameters of the informed consent doctrine in *Pratt v. University of Minn. Affiliated Hospitals*, 414 N.W.2d 399, 401 (Minn. 1987). Nonetheless, it felt that *Pratt* had left open the issue of whether a negligent nondisclosure action can be maintained if injuries result from alleged nontreatment rather than from affirmative treatment. In *Pratt*, by dictum, we did opine that while diagnosis without more usually does not give rise to a duty to disclose risks arising from an undiagnosed condition, nevertheless, there may exist some nontreatment situations, even involving diagnosis, where the negligent nondisclosure rule would apply, referring to *Gates v. Jensen*, 92 Wash.2d 246, 250–51, 595 P.2d 919, 922–23 (1979) as being illustrative. In

*Gates* a physician had diagnosed the patient's problem as an eye irritation probably resulting from the use of contact lenses. Reliance upon the tests employed precluded the physician from ruling out the possibility of the presence of glaucoma. The doctor not only failed to advise the patient of her inability to rule out glaucoma, but further failed to advise the patient that additional and inexpensive tests were available which would be definitive as to the existence of glaucoma. In these circumstances, the Washington Court imposed upon the diagnostic physician the duty to relay that information to the patient thereby affording the patient a chance to opt for, or to decline, further testing. *Id.* When the failure to advise resulted in glaucoma and blindness, the physician could be liable in damages.[9] In *Pratt* we declined to follow *Gates*, and, in fact, distinguished it. *See Pratt*, 414 N.W.2d at 402. The appeals court panel in this case, nonetheless, apparently concluded that, so to speak, in *Pratt* we had "opened the door" to impose upon a physician an additional duty to disclose any risk of nontreatment by failure to advise the patient of the availability of additional, as distinguished from alternate, treatment. That conclusion was unjustified. In *Pratt* we only acknowledged, that in some circumstances similar to those existing in *Gates*, a duty

position when deciding to accept or reject other treatment.

(3) The physician failed to disclose the risk of the treatment rendered *or of nontreatment* to the patient.

(4) A reasonable person in the patient's position would not have consented to the treatment *or to nontreatment* if the alternative treatment had been known, and

(5) The injury sustained by Justin Madsen would have been avoided by the undisclosed alternative treatment.

(Emphasis supplied.)

8. In declining to expand the informed consent/failure to warn doctrine to situations such as in the instant case, the court in *Kalsbeck* stated:

The doctrine of informed consent does not apply to situations where the patient's decision is whether to submit to treatments in addition to the basic treatment given. Rather, it applies only to situations where the choice is between two or more distinct, alternative methods of treatment.

*Kalsbeck,* 375 N.W.2d at 869.

9. Although almost a decade has elapsed since *Gates* was decided, no evidence exists that it has been hailed by courts or commentators as significantly altering or expanding the general rule of informed consent/nondisclosure prevalent in most jurisdictions substantially as it has existed in Minnesota. Our search has failed to reveal any case outside the State of Washington in which *Gates* has been cited as persuasive authority. In fact, we were unable to locate any citation of *Gates* in any appellate court opinion other than in our *Pratt* decision and in the court of appeals opinion in the present case. Moreover, counsel have not directed our attention to any case in any other jurisdiction that has expanded liability based upon failure to advise of additional treatment and the risk inherent in not taking additional treatment.

might arise to advise the patient of the availability of additional diagnostic tests which, if given, would be essentially determinative of the presence of disease. That situation does not exist in the present case.

As was *Pratt*, this case is clearly distinguishable from *Gates*. This case does not involve an alleged negligent diagnosis. In *Gates* the failure of the attending physician to provide the patient the option of submitting to tests which would have confirmed the presence of treatable glaucoma resulted in the patient's blindness. Here, no one claims that any further diagnostic tests by Dr. Solberg would have presented to the Madsens an option which, if exercised, could have avoided Jason's physical disabilities. The medical testimony indicates the nonexistence of tests available prior to or on December 31 which would have revealed the likelihood of abruption of the placenta. Since no one knows the cause of abruption of the placenta, no one could affirm that rupture of the membranes with consequent leaking of amniotic fluid was its cause in Mrs. Madsen's case. Thus, absent proof of the existence of negligent diagnosis, or that even had it existed, that it was the cause of Justin's injuries, we decline to extend the rationale of *Gates* to this case.

▬ Nor can we accept the respondent's contention that the designation of this case by the court of appeals panel as a "nontreatment" case is consistent with our holding in *Pratt*. Respondent characterizes bedrest at home with instructions relative to monitoring as being "nontreatment"

whereas, apparently in his view, hospitalization bedrest with similar instructions would have been "treatment." Adoption of that argument would conflict with *Kalsbeck* which held that home bed rest did constitute "treatment," and as well with *Pratt*, where the court of appeals originally gave the word "treatment" a broad construction.[10] On appeal, we concurred by stating that for the purpose of the nondisclosure doctrine, the word "treatment" should be afforded a broad construction. *See Pratt*, 414 N.W.2d 399, 402. Given the broad interpretation of the word "treatment" embraced by both the court of appeals and this court in *Pratt*, we must reject the respondent's assertion that bed rest when combined with specific instructions, as was done here, would not constitute "treatment."

▬ Alternatively, the respondent argues, and the court of appeals panel held, that the instant case is, in fact, an alternative treatment case. Accordingly he claims that under *Cornfeldt v. Tongen I*, 262 N.W.2d 684 (Minn.1977) and *Cornfeldt v. Tongen II*, 295 N.W.2d 638 (Minn.1980), he was entitled to have his requested negligent nondisclosure instruction read to the jury. The court of appeals panel decision attempted to distinguish *Kalsbeck* by suggesting that in *Kalsbeck* the doctor was confronted with "an abundance of choices," whereas in the instant case the choice was between home treatment consisting of rest with restrictions and self monitoring or hospitalization with identical restrictions

---

**10.** In *Pratt* the court of appeals panel noted: "Treatment" has been broadly construed by other courts. The Iowa Supreme Court, for example, has stated that "treatment is broad enough to embrace all steps in applying medical arts to a person." *Head·v. Colloton*, 331 N.W.2d 870, 875 (Iowa 1983). Similarly the Missouri Court of Appeals has stated that treatment consists of the "measures necessary for the physical well being of the patient." *Patrich v. Menorah Medical Center*, 636 S.W. 2d 134, 140 (Mo.Ct.App.1982); *see also Stephens v. Williams*, 226 Ala. 534, 147 So. 608, 612 (1933) (holding that an allegation of "neg-

ligent treatment" encompassed negligence in performing an examination and diagnosis). These broad definitions of treatment clearly would include genetic counseling.

A broad definition of treatment has also been employed by several courts when construing hospitalization insurance policies. These courts have defined treatment to include "examination and diagnosis". *See also* Black's Law Dictionary at 1346 (5th Ed.1979) (stating that treatment includes "examination and diagnosis as well as application of remedies"). *Pratt*, 403 N.W.2d 865, 868 (Minn.App. 1987). (Citations omitted).

and monitoring but by hospital personnel.[11]

In sum, we concur with the trial court's analysis that Dr. Solberg's decision to manage Mrs. Madsen's pregnancy in a home setting, rather than at a hospital, did not involve a choice between alternative methods of treatment. Whether Mrs. Madsen was or was not hospitalized, her treatment would have been the same in either place and with the same risks. Any choice would affect only the situs of the patient's care, not the care itself. The operative facts of this case in all material respects are indistinguishable from those in *Kalsbeck*. In both the home treatment was identical to that available in the hospital. The option of hospitalization was not an alternative but was rather an additional available treatment.

The informed consent/nondisclosure doctrine does not involve negligence in the administration of treatment, in failure to treat, or in failure to properly diagnose. Physician liability is imposed by the rule only for failure to secure the patient's informed consent to treatment which results in harm which the patient would have avoided by declining the treatment or by choosing an alternative treatment.

The pleadings and the trial record reveal that during the course of this litigation the principle thrust of respondent's claim has been that Dr. Solberg rendered negligent treatment by failing to insist that Mrs. Madsen be hospitalized on December 29. As noted by the trial court, whether failure to hospitalize on December 29 constituted negligent treatment as well as whether such alleged negligence caused Justin's injuries were vigorously contested issues. Those general claims, and the subsidiary specific claims, related to negligent treatment only. Broad latitude at trial was given to all parties to present evidence and to argue all theories of liability in final argument. By its verdict, the jury rejected

all of respondent's theories of negligent treatment. Respondent's consent/negligent nondisclosure claim is no different; the negligence is bottomed on Dr. Solberg's failure to hospitalize under the conditions existing on December 29.

Accordingly, we hold the trial court properly rejected respondent's proffered instruction. Reversed and remanded with instructions that the trial court judgment be reinstated.

COYNE, J., took no part.

---

11. In advancing this contention, respondent has shifted his position from that he espoused when profering the requested instruction which, although substantially identical with JIG 427.1

differed in the main in only claiming that the jury should have been informed that the physician should have been advised of the risk of "nontreatment."