[No. 16219-9-II.    Division Two.    April 28, 1995.]

THE ESTATE OF JOYCE DIANE LAPPING, *Appellant*, v. GROUP HEALTH COOPERATIVE OF PUGET SOUND, ET AL, *Respondents*.

---

614

*David W. Soukup* and *Levinson, Friedman, Vhugen,* for appellant.

*Dinah C. Pomeroy* and *Rosenow, Johnson, Graffe,* for respondents.

MORGAN, J. — In this medical malpractice case, the personal representative of Joyce Lapping's estate appeals from a jury verdict in favor of Group Health. We reverse in part and affirm in part.

In the fall of 1987, Joyce Lapping was experiencing irregular menstruation. Thus, she sought the advice of her Group Health physician, Dr. Daniel Dugaw.

At that time, Lapping was 48 years old. She had a history of seizures, but had not had one for 9 years. She was taking Dilantin prescribed by Dr. Dugaw, who had been her physician since 1981.

Concerned about cancer, Dr. Dugaw decided to perform an endometrial biopsy. The purpose of that procedure is to remove, for later examination in the laboratory, a tissue sample taken from the lining of the uterus. Dr. Dugaw performed a biopsy on October 23, 1987, but obtained insufficient tissue for laboratory analysis.

A second biopsy was scheduled for November 12, 1987. When Lapping arrived at the Group Health Clinic, she was placed in a treatment room. There, she met Beth Baker, the nurse assigned to assist Dr. Dugaw. Baker took her blood

pressure, which was normal. Dr. Dugaw then came into the room and went over a consent form. He had gone over the same form on October 23, and "the previous consent form . . . was pretty fresh in both our minds."[1] Paragraph 4 stated in part, "I have been informed of certain risks and complications that can reasonably be anticipated", including "pain, bleeding, infection, perforation of uterus". Paragraph 5 stated in part, "I have been informed that there are significant risks such as severe loss of blood, infection and cardiac arrest that can lead to death or permanent or partial disability, which may be attendant to the performance of any procedure." Paragraph 6 stated in part, "I consent to the administration of anesthesia . . .," and "I understand that all anesthetics involve risks of complications and . . . in some cases may result in paralysis, cardiac arrest and/or brain death from both known and unknown causes."[2] Dr. Dugaw did not tell Lapping that her seizure history would or would not affect the risks described in the consent form. Nor did he tell her that the biopsy could be performed in a hospital, with more precautions than were available in the clinic.

Lapping signed the consent form at approximately 10:20 a.m.[3] She was then positioned on the examination table, with Dr. Dugaw at her feet and Baker to Dr. Dugaw's right. A drape was placed across her midsection, so the upper part of her body was visible to Baker but not to Dr. Dugaw. No equipment was used to monitor breathing, blood pressure or pulse, and the nearest "crash cart" was in the room next door.[4] No one checked the level of Dilantin in Lapping's

---

[1] Report of Proceedings, at 186.

[2] Ex. 7.

[3] Baker wrote on the consent form that the time of signing it was 11:20 a.m. At trial, however, she explained that she had read her watch incorrectly, and that the time was actually 10:20 a.m.

[4] A crash cart "has the various devices [physicians] use in a situation of a cardiac arrest, such as an airway tube, an Andrew bag, which allows you to artificially breathe for the patient, defibrillator, which would allow a physician to resuscitate from a cardiac arrest, and various medications that are used in the resuscitative efforts". Report of Proceedings, at 265.

bloodstream, although Dr. Dugaw thought it was probably too low to be effective.[5]

Between 10:23 and 10:27 a.m., according to Dr. Dugaw's estimate, Lapping was injected with lidocaine. After waiting a short time for the drug to take effect, Dr. Dugaw said he was ready to start, and Lapping answered, "Okay". After probing the uterus to ascertain its size, Dr. Dugaw then started the biopsy itself.

The biopsy involved scraping tissue from a small area of the uterus, using a medical instrument called a curet. "After several passes with the curet, . . . the patient had what appeared to be a seizure and jerking motions, and it was obvious that there was something that was going on."[6]

The seizure began at approximately 10:30 a.m. and lasted 15 to 30 seconds. When it was over, Lapping had neither a pulse nor blood pressure. She also was not breathing, although she had "irregular gasping respirations" of a type "common in somebody who is in respiratory arrest".[7] Dr. Dugaw attempted cardiopulmonary resuscitation (CPR) while Baker "called a code".

Three doctors and several nurses responded. The crash cart was brought in from the next room, an endotracheal tube was inserted, a cardiac monitor was put in place, an IV was started, and efforts at CPR continued. The tube was inserted at 10:36 a.m., according to the Group Health chart.

Paramedics were dispatched at 10:32 a.m. and arrived at 10:41 a.m., according to their report.[8] They observed that Lapping's pupils were unequal and unresponsive, a condition caused by prolonged lack of oxygen to the brain. After attempting to resuscitate unsuccessfully, they took Lapping to St. Francis Hospital, where she was pronounced dead.

On March 16, 1990, Lapping's daughter, acting as the personal representative of Lapping's estate, sued Dr. Dugaw and

---

[5]An autopsy showed the level of Dilantin was indeed too low to be effective in preventing seizures.

[6]Report of Proceedings, at 154.

[7]Report of Proceedings, at 158-60.

[8]The Group Health chart indicates the paramedics arrived at 10:38 a.m.

Group Health. She alleged that the Defendants "negligently performed and failed to perform required medical services and otherwise acted and failed to act in ways which constitute negligence". She also alleged that the Defendants "failed to inform decedent of material risks and alternatives to the proposed course of treatment thereby causing decedent to consent to such treatment without being aware of material risks and alternatives". Thus, she asserted causes of action for negligent treatment and lack of informed consent.

A jury trial commenced on November 4, 1991. At the end of the evidence, the Defendants moved to dismiss the cause of action for lack of informed consent, and the trial court granted the motion. A short time later, the jury was instructed to decide whether the Defendants had been negligent in failing to (1) insure Dilantin was at a therapeutic level before doing surgery, (2) monitor Lapping's blood pressure, respiration and heart function during surgery, and (3) provide an adequate supply of oxygen by means of timely intubation and CPR.

On November 19, 1991, the jury returned a special verdict form stating that the Defendants had not been negligent. The trial court denied posttrial motions and entered judgment on the verdict.

Plaintiff now appeals, raising four issues. They concern (1) attorney misconduct, (2) informed consent, (3) instruction 13, and (4) the cross examination of a defense witness, Dr. Yuen.

I

ATTORNEY MISCONDUCT

Dr. Ted L. Rothstein, a board certified neurologist, was called as a witness for Plaintiff on the afternoon of November 7. During cross examination, defense counsel asked, "Doctor, what's the nature of the investigation that's currently being done about you by the Medical Disciplinary Board of this State?"[9] Plaintiff's counsel immediately objected, and the court held a sidebar conference during which defense counsel

---

[9]Report of Proceedings, at 298.

said "she had no idea what the answer [to the question] was".[10] The jury was then sent out, and Plaintiff's counsel argued, among other things, that "[w]hether Dr. Rothstein is being investigated . . . or not, the answer would not be admissible". At some point, it was also discovered that there was no investigation pending.[11] Stating that the question "was not an ethical question to be asked", and that the question "dar[ed] everybody involved to have a mistrial",[12] the trial judge asked Plaintiff's counsel if he wanted a mistrial. Plaintiff's counsel answered no, but a short time later asked if he could consider the problem overnight. The trial judge indicated he would grant a mistrial if one were desired, but he denied leave to delay overnight. Plaintiff's counsel declined a mistrial, and the court and the parties formulated a limiting instruction that was read to the jury upon its return. The instruction stated:

> Ladies and gentlemen of the jury, I have talked to all counsel. There does not appear to be any evidentiary basis for the last question. It should not have been asked. And you are hereby directed to thoroughly disregard the question and any inferences that might be drawn from it. That is an order of the court, an order to strike that from any kind of consideration whatsoever. [13]

After the jury returned a defense verdict, Plaintiff moved for new trial based on defense counsel's misconduct. The trial court denied the motion, and Plaintiff now assigns error to that ruling.

■ Defense counsel's question constituted egregious misconduct. There was no basis for asking it,[14] and "[i]t is axiomatic that counsel cannot ask questions of a witness that

[10]Report of Proceedings, at 299.

[11]Br. of Resp't, at 7-8. In an affidavit filed after trial, the program manager of the Medical Disciplinary Board stated that on November 7, 1991, there was no investigation pending against Dr. Rothstein.

[12]Report of Proceedings, at 303.

[13]Report of Proceedings, at 307.

[14]In an affidavit filed after trial, a paralegal for defense counsel states that before trial she telephoned the Medical Disciplinary Board and was told by an

have no basis in fact and are merely intended to insinuate the existence of facts to a jury". *Del Monte Banana Co. v. Chacon*, 466 So. 2d 1167, 1172 (Fla. Dist. Ct. App. 1985). Moreover, as Plaintiff correctly points out, there was no answer to the question that could possibly have been admissible under the Rules of Evidence.[15] The pendency of an investigation into an unknown and unspecified complaint simply had no tendency to prove or disprove a fact of consequence to the action. ER 401-02.

■ The question was patently prejudicial. The case was close, and the question impugned the character and credibility of a significant witness. *Poole v. University of Chicago*, 186 Ill. App. 3d 554, 560, 542 N.E.2d 746, 750 (prejudice generated by evidence of pending disciplinary investigation), *appeal denied*, 128 Ill. 2d 672 (1989); *Purvis v. Johnson*, 430 S.W.2d 226, 231 (Tex. Civ. App. 1968) (prejudice generated by hearsay letter impugning doctor's competence).

The issue is remedy. The Defendants say Plaintiff waived any right to a new trial when she declined the trial court's offer of a mistrial. *See Nelson v. Martinson*, 52 Wn.2d 684, 689, 328 P.2d 703 (1958); *Casey v. Williams*, 47 Wn.2d 255, 287 P.2d 343 (1955); *Sun Life Assur. Co. v. Cushman*, 22 Wn.2d 930, 945, 158 P.2d 101 (1945). Arguing to the contrary, the Plaintiff says she was entitled to wait and ask for a mistrial after the verdict had been returned. In short, the Plaintiff claims that misconduct of the sort present here gives rise to a right to gamble on the verdict.

Plaintiff relies on *Carabba v. Anacortes Sch. Dist. 103*, 72 Wn.2d 939, 953, 435 P.2d 936 (1967). There, defense counsel engaged in one instance of deliberate misconduct early in the trial, and three more during closing arguments. The

unknown or unnamed person that a complaint against Dr. Rothstein was currently being investigated. She was also told that no other information could be provided. Clerk's Papers, at 67. For the reasons illustrated by this case, we consider this a wholly inadequate factual basis for a question such as the one asked here.

[15]*See* RPC 3.4(e) ("[a] lawyer shall not . . . allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence").

Plaintiff did not request a mistrial until after the jury had returned a defense verdict. The Supreme Court stated:

> This latter concept [of "gambling on the verdict"] has no place in the court's consideration of a motion for a new trial where the acts upon which such motion is based are acts of prejudicial misconduct, which were incurable, especially where such acts occurred at or near the end of the trial. To hold otherwise would be to place appellant on the horns of an impossible dilemma.

*Carabba*, at 954.

Although the issue is close, we decline to apply *Carabba* for at least three reasons. First, *Carabba* is based in part on the idea that the deliberate misconduct was incurable. Here, however, the misconduct might have been cured. The trial court flatly told the jury that there was no basis for defense counsel's question. That is the type of curative instruction, as opposed to some others, that a jury is likely to heed. *See Lockwood v. AC&S, Inc.*, 44 Wn. App. 330, 358, 722 P.2d 826 (1986) (jury presumed to follow trial court's instructions), *aff'd*, 109 Wn.2d 235, 744 P.2d 605 (1987).

Second, *Carabba* is based in part on the idea that allowing the Plaintiff to gamble on the verdict will engender minimal waste of judicial resources. In *Carabba*, most of the misconduct was at the very end of the trial; thus, allowing the Plaintiff to gamble on the verdict (*i.e.*, to obtain a mistrial after verdict, as opposed to immediately after the misconduct) engendered little waste of judicial resources. Here, however, the misconduct was on November 7, and the verdict was not returned until November 19. Thus, if we were to allow the Plaintiff to gamble on the verdict in this case, we would be allowing the Plaintiff to squander nearly 2 weeks of the Superior Court's time.

Third, *Carabba* is based in part on the idea that unless a wronged party is allowed to gamble on the verdict, there is no effective remedy for deliberate misconduct near the end of a trial; the wronged party will suffer either improper prejudice if the current trial continues to verdict, or the time and expense of a new trial if the current trial is aborted. Here, however, there was an effective remedy other than gambling on the verdict, for the trial court, in conjunction with grant-

ing a mistrial, could have assessed *substantial* terms that would have compensated the Plaintiff, and perhaps the court as well, for economic damage resulting from the misconduct. *State ex rel. Macri v. Bremerton,* 8 Wn.2d 93, 105, 111 P.2d 612 (1941) (quoting *Guay v. Brotherhood Bldg. Ass'n,* 87 N.H. 216, 177 A. 409, 97 A.L.R. 1053 (1935); *cf. In re Freitas,* 58 Wn.2d 400, 402, 363 P.2d 385 (1961) (terms required as condition to voluntary nonsuit where litigant inflicted substantial costs on opponent). A remedy of this sort would not have been perfect,[16] but it would have gone far toward correcting the problem identified in *Carabba.*

Summarizing, there was prejudicial misconduct by defense counsel. The trial court would have been fully justified in granting a mistrial on November 7, and in assessing terms so Plaintiff would not be prejudiced economically. When the Plaintiff declined a mistrial, however, she waived any absolute right to new trial that the misconduct might have generated; the matter became one for the trial court's discretion; and the trial court did not abuse its discretion by denying a new trial after verdict. *Bulzomi v. Department of Labor & Indus.,* 72 Wn. App. 522, 530, 864 P.2d 996 (1994).

## II

### INFORMED CONSENT

At trial, Dr. Rodney Brown, a board certified anesthesiologist, testified for Plaintiff. He said that in light of Lapping's history of seizures, Lapping should have been informed that she could undergo the operation as an outpatient at a hospital, where oxygen would have been immediately available, an IV would have been in place, a blood pressure cuff would have been in place, a cardiac monitor would have been used, and there would have been close visual scrutiny. He opined that Lapping died "because it was not recognized that she had had cardiac respiratory collapse in time, not resuscitated in time to save her before she was irreparably damaged by hypoxia".[17] He said that Lapping would not have

---

[16]See Br. of Appellant, at 17.

[17]Report of Proceedings, at 210.

died if she had received timely intubation and CPR, and that a person closely monitoring Lapping would have noticed a slowing of the pulse, a drop in blood pressure, and a change in the level of consciousness 3 to 4 minutes before the seizure occurred. He added, however, that lidocaine causes seizures in less than one-half of 1 percent of patients with a history of seizures, and a later defense witness testified that lidocaine triggers seizures only rarely.

As noted above, Dr. Rothstein also testified for Plaintiff. He said that "Lapping died because of a lack of oxygen to the brain, to the point where it produced irreversible brain damage."[18] Noting that the paramedics had observed nonreactive and asymmetrical pupils, he said there had been a severe lack of oxygen to the brain for more than 5 minutes. When asked whether Lapping would have died if she had received timely intubation and CPR, he replied, "I don't think so."[19]

At the close of the evidence, the Defendants moved for a directed verdict on the issue of informed consent. They argued that because the risk of problems in the clinic setting was so slight, they had not been required to advise Lapping of the option of having the biopsy in a hospital, with the extra precautions that would entail. Plaintiff's counsel argued:

> The violation of the standard of care here was in a failure to specifically disclose to the patient, as Dr. Brown testified was required by the standard of care, that as an alternative to doing this procedure in an office, without an immediate availability of oxygen, without the placement of an IV line, without a cardiac monitor, without a blood pressure cuff in place, the patient could choose to, in fact, have this procedure done as an outpatient procedure in the hospital where all of those things would be available to deal with a cardiac arrest, if one in fact occurred.[20]

The trial court granted the motion and declined to instruct on informed consent.

Plaintiff now claims the trial court erred in directing a verdict for Defendants on her cause of action for informed

---

[18]Report of Proceedings, at 258.

[19]Report of Proceedings, at 258.

[20]Report of Proceedings, at 688.

consent. This is true, she says, because "[m]edical testimony established there was a reasonable alternative to the procedure as performed", and Dr. Dugaw did "not advise the patient of that alternative".[21]

■ The premise of the doctrine of informed consent is that every adult of sound mind has a right to decide what happens to his or her body. A necessary corollary is that the individual be given sufficient information to make an *intelligent* decision. *Smith v. Shannon*, 100 Wn.2d 26, 29-30, 666 P.2d 351 (1983).

RCW 7.70.050(1) lists the elements of a cause of action for informed consent. It states:

> The following shall be necessary elements of proof that injury resulted from health care in a civil negligence case or arbitration involving the issue of the alleged breach of the duty to secure an informed consent by a patient or his representatives against a health care provider:
>
> (a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
>
> (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
>
> (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
>
> (d) That the treatment in question proximately caused injury to the patient.

*See also Bertsch v. Brewer*, 97 Wn.2d 83, 90, 640 P.2d 711 (1982); *Bays v. St. Luke's Hosp.*, 63 Wn. App. 876, 880-81, 825 P.2d 319, *review denied*, 119 Wn.2d 1008 (1992); *Ruffer v. St. Cabrini Hosp.*, 56 Wn. App. 625, 630, 784 P.2d 1288, *review denied*, 114 Wn.2d 1023 (1990).

RCW 7.70.050(2) defines a "material" fact. It states that a fact is material "if a reasonably prudent person in the position of the patient or his representative would attach significance to it [when] deciding whether or not to submit to the proposed treatment". Thus, Washington follows a reasonable patient standard, as opposed to a professional medical standard.[22] W. Page Keeton et al., *Prosser and Keeton on*

---

[21]Br. of Appellant, at 13.

[22]Under the professional medical standard, a fact is material if physicians customarily inform their patients of it, or if a reasonable physician would make

*Torts* § 32, at 191 (5th ed. 1984); 2 J.D. Lee & Barry A. Lindahl, *Modern Tort Law* § 25.32, at 306, § 25.34, at 310-11 (rev. ed. 1990); 4 Stuart M. Speiser et al., *American Law of Torts* § 15:72, at 652 (1987); 61 Am. Jur. 2d *Physicians, Surgeons* § 187, at 318, § 189, at 320-22 (2d ed. 1981).

■ When the issue is the propriety of a directed verdict, or the propriety of a refusal to give proposed jury instructions, materiality must be recast in terms of the burden of production. *See, e.g., Bertsch v. Brewer,* 97 Wn.2d at 90-91 (describing and applying burden of production); *Brown v. Dahl,* 41 Wn. App. 565, 573, 705 P.2d 781 (1985). Materiality presents a jury question if any rational trier of fact could find, based on a preponderance of evidence, that a reasonably prudent person in the position of the patient, when deciding whether to submit to the proposed treatment, would have attached significance to the fact in issue. *See Brown,* at 574; *Archer v. Galbraith,* 18 Wn. App. 369, 376, 567 P.2d 1155 (1977), *review denied,* 90 Wn.2d 1010 (1978). Immateriality is shown as a matter of law if no rational trier could find, based on a preponderance of evidence, that a reasonably prudent person in the position of the patient, when deciding whether to submit to the proposed treatment, would have attached significance to the fact in issue.

These principles are found in various cases, though not always in the terms we use here. In *Ruffer v. St. Cabrini Hosp.,* 56 Wn. App. at 629, the risk of perforating the colon during surgery of the colon was 1 in 20,000 to 50,000. The trial court granted summary judgment, in effect holding that no rational trier of fact could find that a reasonably prudent person in the patient's shoes would attach significance to such a minuscule risk. Division One affirmed.

In *Brown,* the trial court dismissed as a matter of law, even though there was "some" expert testimony explaining that the doctor had failed "to apprise [the patient] of the risks of general anesthesia and of the available alterna-

the disclosure under the same or similar circumstances. W. Page Keeton et al., *Prosser and Keeton on Torts* § 32, at 191 (5th ed. 1984); 61 Am. Jur. 2d *Physicians, Surgeons* § 187, at 318 (1981).

tives". *Brown*, 41 Wn. App. at 572. This division reversed. In effect, it held that in light of the evidence presented, a rational trier could have found that a reasonable person in the patient's shoes would have attached significance to the omitted information.

In *Archer*, a surgeon failed to advise the patient of various risks associated with a hemi-thyroidectomy. He also failed to advise of the possibility of observing the affected gland, without surgery, to see if it changed over time. The trial court removed informed consent from the jury's consideration. Division One reversed, in effect holding that a rational trier could have found that a reasonable person in the patient's shoes would have attached significance to the omitted information. *Archer*, 18 Wn. App. at 378.

The question here is whether a rational trier of fact could have found, by a preponderance of evidence, that a reasonably prudent person in Lapping's position would have attached significance to the fact that the endometrial biopsy could have been done in a hospital with more equipment and greater precautions than were available in the clinic. In our view, the answer is yes. Lapping was not a normal patient; she had a history of seizures and was taking Dilantin. Moreover, Dr. Brown testified:

> Q: Does the standard of care . . . require the patient be advised of any alternatives to having this procedure being [*sic*] done in a clinic . . ..
>
> A: Yes.
>
> Q: What alternatives should the patient be told are available . . ..
>
> A: In this case, the patient . . . should have been told that this could be done as outpatient procedure in the hospital.[23]

As noted above, Dr. Brown also said that if the procedure had been done in a hospital, Lapping would have been monitored by electrocardiogram and blood pressure cuff, as well as visually; an IV would have been placed before problems developed; and she should not have died. Cumulated, this evidence supports an inference that a reasonable person in Lapping's shoes would have wanted to consider the possi-

---

[23]Report of Proceedings, at 215.

bility of having the biopsy in a hospital, with the additional equipment and precautions there available. We conclude that informed consent was a matter for the jury to decide.

Our conclusion is not affected by *Madsen v. Park Nicollet Med. Ctr.*, 431 N.W.2d 855, 861 (Minn. 1988), a case relied on by Defendants. Arguably, the starting point for informed consent is the inviolability of the patient's body. *See Mason v. Ellsworth*, 3 Wn. App. 298, 308, 474 P.2d 909 (1970). If that is true, the duty to obtain an informed consent arises when a physician proposes treatment that will invade the patient's body; arguably, however, it does not arise when a physician merely gives noninvasive medical advice. That seems to be the idea embodied in *Madsen*, where a pregnant woman was experiencing intermittent vaginal bleeding, and the doctor prescribed bed rest at home rather than hospitalization. *Madsen* has no applicability here, where Dr. Dugaw proposed to perform an invasive procedure. *Madsen* may also be contrary to Washington law, although we need not decide that today. *See* RCW 7.70.050; *Gates v. Jensen*, 92 Wn.2d 246, 250-51, 595 P.2d 919 (1979).

Nor is our conclusion contrary to *Mason*. In that case, the court held that a doctor's failure to advise of a .0075 risk of perforation during an esophagoscopy did not raise a jury question on informed consent. We do not quarrel with that holding, given the facts of that case (especially the fact that the patient was not known to have a preexisting condition such as epilepsy). The facts of this case are different, however. Because Lapping was epileptic and taking Dilantin, there is a reasonable inference that a reasonable person in her shoes would have wanted to know of and consider having the biopsy done in a hospital, with the additional equipment and precautions there available. We hold the trial court erred by not submitting to the jury the Plaintiff's cause of action for informed consent.

## III

### JURY INSTRUCTION 13

Over Plaintiff's objection, the trial court gave instruction 13. It provided:

A doctor does not guarantee a good medical result. A poor medical result is not, in itself, evidence of any wrongdoing by the doctor.[24]

■ Plaintiff claims this instruction was an unconstitutional comment on the evidence. According to the Supreme Court, however, such an instruction is a matter for the trial court's discretion. *Christensen v. Munsen*, 123 Wn.2d 234, 247-48, 867 P.2d 626 (1994).

## IV

### CROSS EXAMINATION OF DR. YUEN

At trial, Dr. Douglas Yuen, an obstetrician-gynecologist, testified for the defense. On direct examination, he testified that Dr. Dugaw met the standard of care applicable to the biopsy, and that the standard of care does not require an IV line, a cardiac monitor, blood pressure cuff, or oxygen in the room. He also testified that the standard of care does not require a doctor to tell the patient that the procedure could be performed in a hospital rather than an office, or that an IV line, blood pressure cuff, and cardiac monitor would be available in a hospital but not in an office. Generally, then, he testified about informed consent and the biopsy itself, but not about the seizures or the postseizure attempts at resuscitation.

On cross examination, Plaintiff's counsel asked questions about resuscitation equipment that should have been available, and about Dr. Dugaw's resuscitation efforts. The Defendants objected, the trial court sustained,[25] and the Plaintiff now assigns error to that ruling.

---

[24]Clerk's Papers, at 28.

[25]The trial court stated:

"The fact that the endotrachial tube should be available, I believe, has already been testified to. But if it has not, I would allow him to testify to that. As to the other things, they are beyond the scope of the direct examination, and it's on that basis that I have sustained the objection. . . .

"[Defense counsel] only asked about what certain things, they were or were not within the standard of care. And she did ask the question about what equipment should be available. She didn't ask anything at all about the speed with which it would be inserted or operative or used. And she chose to stop at that point." Report of Proceedings, at 620-21.

Under ER 611(b), "[c]ross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." The scope of cross examination lies within the sound discretion of the trial court, and will not be disturbed on appeal unless no reasonable person would take the position adopted by the trial court. *State v. Lord*, 117 Wn.2d 829, 870, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112, 113 S. Ct. 164 (1992); *Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 264, 828 P.2d 597, *review denied*, 119 Wn.2d 1020 (1992); *Bays v. St. Luke's Hosp.*, 63 Wn. App. at 885. Here, it was not an abuse of discretion to consider the biopsy as a subject separate from resuscitation, and to limit cross examination accordingly.

The judgment dismissing the cause of action for informed consent is reversed, and a new trial is awarded on that cause. In all other respects, the judgment is affirmed.

SEINFELD, C.J., and ALEXANDER, J. Pro Tem., concur.